# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 21, 2021

Lyle W. Cayce
Clerk

No. 20-30356

Adam Kokesh,

*Plaintiff—Appellee*,

*versus*

Kevin Curlee,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-1372

Before Elrod, Willett, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

This is another case involving a law enforcement officer's defense of qualified immunity. But unlike most cases involving qualified immunity, this one raises no issue with regard to excessive force, or an unconstitutional search of a premises. In fact, this story begins not even with a traffic stop. Rather, this federal civil rights lawsuit has blossomed from the attempt by a state trooper to render roadside assistance.

No. 20-30356

# I.

On the night of January 2, 2019, Louisiana State Trooper Kevin Curlee, patrolling in the New Orleans area, came upon a pickup truck stopped on the shoulder of the Carrollton Overpass on Interstate 10. The pickup truck had its emergency hazard lights blinking, its hood open,[1] and also a visible current handicap license plate. Two people stood outside the truck. Trooper Curlee pulled his marked Louisiana State Police ("LSP") unit, with its emergency lights flashing, behind the pickup truck. He then started his bodycam, which stayed on for several hours thereafter and throughout all material times relative to this matter. Both from the bodycam footage,[2] as well as through judicial notice,[3] we note the following about this location:

---

[1] Kokesh submitted and cites to Curlee's "arrest narrative," which contains the description of the truck's hood being open. Kokesh does not deny and offers no explanation as to why the hood of the truck was open, other than stating that it is not visible on Curlee's bodycam recording. At any rate, the Court's ruling does not depend on whether the hood was open or not.

[2] Although all alleged facts are taken as if they are true, facts established by a video record control when they clearly contradict the facts contained in a pleading. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004). Here, Curlee has attached a video of the incident, which is available at: http://www.ca5.uscourts.gov/opinions/pub/20/20-30356.mp4. There are several points of material fact on which the video clearly contradicts Kokesh's alleged facts. On these facts, the video will control. It is curious that Kokesh did not provide his video of this incident, but we assume it shows events no differently.

[3] The dissent accuses us of "peeking outside the record to assess the history and characteristics of the Carrollton Overpass and its purported dangers," but this critique falls flat. *Post* at 25. Indeed, each and every fact regarding the Overpass which we supply by judicial notice not only provides texture, context, and assistance in the fact-intensive inquiry we must perform, but is also "generally known within the trial court's territorial jurisdiction" *and* capable of being "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b). As a result, no such fact "is . . . subject to reasonable dispute" under the applicable rule of evidence, and

No. 20-30356

The Pontchartrain Expressway portion of Interstate 10 in New Orleans runs from the Jefferson-Orleans Parish line to the foot of the Crescent City Connection, which spans the Mississippi River. For the last 60-plus years, it has been the single major express thoroughfare between downtown New Orleans, its Central Business District (or "CBD"), and the French Quarter on its eastern side, and Metairie, Kenner, and Armstrong International Airport to the west. It has six lanes (three in each direction), a regularly-exceeded speed limit of 60 mph, and contains a lengthy section, the "Carrollton Overpass"—also referred to by locals as "the Carrollton Interchange" because of the several crisscrossing on-and-off ramps under it. A significant and central artery of the City's landscape leading to the Louisiana Superdome, the Carrollton Overpass is elevated high above city streets, each side having a barely wide enough shoulder for stalled vehicles and/or distressed drivers, and a low concrete wall on the edge. In short, vehicles parked on the shoulder and the passengers who exit these vehicles, especially at night, are in danger of being struck by oncoming traffic travelling at high interstate speeds, thus endangering lives and creating road hazards. There are hardly any benign reasons why a car or truck, such as the one found this night, would purposely be parked on the shoulder of this elevated expressway after nightfall.[4]

---

the court "may judicially notice" each such fact accordingly. *Id.* It makes no difference whether such facts appear in the record, as "an appellate court may judicially notice certain facts, even if the district court did not." *Brown v. Tarrant Cnty.*, 985 F.3d 489, 493 n.4 (5th Cir. 2021).

[4] Curlee's arrest narrative states that he arrived on the scene of the overpass incident "at approximately 1740 hours," or 5:40 p.m. On the other hand, Curlee's briefing on appeal states that Curlee arrived "shortly before midnight," citing the time index of Curlee's bodycam. Review of Curlee's bodycam footage indicates that Curlee's arrest narrative provides the accurate time—the radio clock on Curlee's LSP unit reads "17:40" when Curlee arrives. In any event, the bodycam footage indicates that the entire incident

No. 20-30356

Viewing the encounter objectively, one would expect Curlee to stop his LSP unit on the overpass behind the stopped pickup truck bearing a handicap license plate, especially upon seeing people outside of the truck and the truck's emergency hazard lights blinking. Reasonably, Curlee's initial concern and inquiry at that time was not possible criminal activity, but rather the safety of the truck's occupants if it had stalled and the safety of other motorists passing at high speeds.

As Curlee pulled behind the truck, he observed one person apparently spraying the overpass wall while another watched or assisted, and discerned that the purpose was to illegally spray paint or stencil a message onto the wall.[5] Reasonably finding such conduct (defacing public property) to be suspicious (not to mention dangerous), Curlee demanded that the man overseeing the spraying get back in the front passenger seat of the truck. He then questioned the man performing the spraying, who gave his name as Elijah Gizzarelli. Gizzarelli denied he was spray painting, and explained that

---

occurred after sunset, and the time discrepancy has no bearing on the issues presented on appeal.

[5] LA. R.S. 14:56.4 provides, in pertinent part:

§56.4. Criminal damage to property by defacing with graffiti

A. It shall be unlawful for any person to intentionally deface with graffiti immovable or movable property, whether publicly or privately owned, without the consent of the owner.

B. As used in this Section, the following terms mean:

(1) "Deface" or "defacing" is the damaging of immovable or movable property by means of painting, marking, scratching, drawing, or etching with graffiti.

(2) "Graffiti" includes but is not limited to any sign, inscription, design, drawing, diagram, etching, sketch, symbol, lettering, name, or marking placed upon immovable or movable property in such a manner and in such a location as to deface the property and be visible to the general public.

he was pressure washing the word "freedom" into the dirt on the wall to promote a book "that's being delivered to every household in New Orleans." Per his law enforcement training, Curlee then placed Gizzarelli in handcuffs, inquired with Gizzarelli about whether there were weapons in the truck, and learned that there were none of which Gizzarelli was aware.

Gizzarelli told Curlee that he and his companions had done extensive legal research to make sure pressure washing the wall was lawful and that they had already pressure washed two other locations. Without verifying Gizzarelli's assertion by examining the wall and the pressure washer, Curlee then told Gizzarelli: "It looks like y'all are spray painting. So if it's not spray paint, that'll be fine."[6] Curlee explained to Gizzarelli how law enforcement officers could reasonably perceive the group's activities as spray painting rather than pressure washing. Gizzarelli responded that he could understand how such a misconception might occur. Curlee recommended that the group avoid "going to do that anywhere else" to avoid getting stopped by law enforcement again. Curlee then walked toward the truck and briefly shined his flashlight into the bed of the truck and onto the site of the alleged pressure washing on the overpass wall. The contents of the truck bed are not apparent on the bodycam video. Further, although the word "freedom" is visible on

_____

[6] We note that Louisiana law requires operators of portable pressure washing equipment to obtain a proper permit from the Department of Energy Quality. LA. R.S. 30:2075; https://deq.louisiana.gov/assets/docs/Permits/LAG750000.pdf. Failure to obtain such a permit may result in a $25,000 fine and/or one year of imprisonment. LA. R.S. 30:2076.2(A)(1), (3). Additionally, it is unlawful to discharge industrial wastewater upon the rights-of-way of state highways without prior written consent from the Department of Transportation and Development and the Louisiana Department of Health. LA. R.S. 48:385. Despite Gizzarelli's apparent lack of authorization to operate pressure washing equipment on a public highway—Gizzarelli even admitted that he had "never used a pressure washer before"—Curlee determined that no one would be arrested or ticketed for unauthorized pressure washing.

the wall, based on the distance between Curlee and the wall, as well as the darkness of the night, the bodycam video is unclear as to whether the stencil was accomplished with white paint or a pressure washer.

Next, Curlee turned to the two other men seated in the truck—the driver and the passenger, who was now videotaping the encounter with Gizzarelli on a cell phone. Curlee called out to the driver of the truck and was met with no response. Curlee then asked Gizzarelli who the driver was, and Gizzarelli enigmatically replied: "I'm not one hundred percent sure of his name to be honest, I think it's, I don't know, he's a friend." At this point, under any objective measure, Curlee surely was required to go further, based on his experience and the puzzling nature of this response. Henceforth, seeking the identity of the three men in and around the truck seemed not only prudent, but necessary, even in hindsight.

Curlee then ordered the driver to step out of the vehicle and requested to see the driver's ID. The driver exited the vehicle and represented his ID to Curlee (showing the name of Robert Evans), thus complying with Curlee's instructions. The driver also asserted he was involved in the Jefferson Parish Libertarian Party. Curlee again observed the third individual, Kokesh, in the passenger seat of the truck, still recording Curlee's every move with a cell phone. Curlee requested to see Kokesh's ID twice and was initially met with no response. After Curlee's third request, Kokesh took out and read from a card to invoke his rights to remain silent and to an attorney, obviously in reference to *United States v. Miranda,* 384 U.S. 436 (1966). But Kokesh was not under arrest or in custody at the time and thus such rights did not legally attach under *Miranda. See id.* at 467–68. Therefore, his failure to cooperate with Curlee in producing requested identification does not fall within the scope of his rights upon arrest. Kokesh further read from his card that he did not consent to a search of any kind, though neither Curlee nor the later-arriving state troopers requested, attempted, or performed a search of the

No. 20-30356

vehicle at any time during the encounter. Indeed, after Evans purportedly identified Kokesh by name, Kokesh continued to refuse to allow Curlee to see his ID and continued his recording of the encounter. Evans stated he "didn't think it was a good idea" to stop on the expressway, and later advised Curlee that it was Kokesh who told him to stop so the wall could be stenciled with the word "freedom" to promote the release of Kokesh's book.

Further fueling Curlee's need to inquire more deeply, Evans then claimed that Kokesh was a candidate for President of the United States— indeed it would be a rare occurrence for a national presidential candidate to be found stopped high atop the Pontchartrain Expressway after nightfall in New Orleans. From the responses given by both Gizzarelli and Evans, it is clear that Kokesh was the instigator, leader, and overseer of the purposeful stop on the shoulder of the Pontchartrain Expressway. Evans, as the driver, and Gizzarelli, as the stenciler, followed Kokesh's instructions. Given the strange circumstances Kokesh created, Curlee then wisely summoned a back-up trooper[7] to assist. At this time, Gizzarelli was still handcuffed, and the lawful detention and investigation were still underway. Determining that further investigation of this truly odd circumstance was warranted, Curlee was thus acting within the scope of LA. R.S. 14:108,[8] which prohibits an

---

[7] Two other LSP troopers arrived, though not together, and one sooner than the other.

[8] LA. R.S. 14:108 provides, in pertinent part:

SUBPART D. OFFENSES AFFECTING LAW ENFORCEMENT

§108. Resisting an officer

A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender

No. 20-30356

individual from resisting an officer by refusing to identify himself during a lawful detention, which this indeed was at the time. And a violation of LA. R.S. 14:108 might result in an arrest of the offender—which ultimately occurred here.

Despite Kokesh's continued intransigence, Curlee, this time accompanied by the back-up trooper who had arrived, again approached Kokesh, who remained seated in the truck's passenger seat continuing his video recording. Curlee again asked to view Kokesh's ID, explaining that the truck was "illegally stopped on the shoulder of the road," and warning Kokesh that he might be arrested if he failed to show his identification. Consistent with the dictates of LA. R.S. 14:108, Curlee indicated that Kokesh might be charged with "interfering with the investigation." Because Kokesh yet again refused to cooperate by showing an ID, he was handcuffed, advised of his *Miranda* rights, and the back-up trooper placed him into the back seat of Curlee's LSP unit. Thus, the arrest had been completed.

---

knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

B.(1) The phrase "obstruction of" as used herein shall, in addition to its common meaning, signification, and connotation mean the following:

* * *

(c) Refusal by the arrested or detained party to give his name and make his identity known to the arresting or detaining officer or providing false information regarding the identity of such party to the officer.

* * *

C. Whoever commits the crime of resisting an officer shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both.

No. 20-30356

Curlee then removed Gizzarelli's handcuffs. Curlee walked over to the stenciling site and shined his flashlight on the "freedom" stencil for a second time. Unlike Curlee's cursory first look, his second view of the stencil was much closer and more careful, and the video clearly shows an absence of dirt rather than white paint. Curlee returned to his LSP unit to grab a camera and walked back to take a photograph of the "freedom" stencil. Curlee then shined his flashlight into the bed of the truck for the second time. Unlike his first look, which was too quick to get a clear view of the contents of the truck bed, Curlee saw the pressure washing equipment the second time and took a photograph of that equipment as well.

Curlee inquired with Evans whether Kokesh had a wallet in the truck, and asked to see it if so. Evans, who again vocalized his realization that he should not have stopped the truck on the highway shoulder to accomplish the pressure washing, located the wallet and handed it to Curlee. Curlee then told Evans, "I see that it's not paint, which I guess, there's no law against cleaning something." This is Curlee's first unequivocal statement confirming Gizzarelli's initial representation that the stencil was pressure washed rather than graffitied with spray paint. Curlee then viewed Kokesh's wallet while seated in his LSP unit.[9] Completing his task, Curlee exited his LSP vehicle, and wrote a ticket to Evans for illegally stopping the truck on the elevated expressway shoulder under LA. R.S. 32:296(A).[10] Evans drove

---

[9] While Kokesh was seated in Curlee's vehicle, Curlee examined the three IDs he now possessed. Kokesh's ID indicated that he was a military veteran, and the computer in the LSP unit disclosed an existing warrant from another jurisdiction. Curlee also searched Kokesh's person, discovered pepper spray and a tool containing a razor blade, and asked Kokesh whether he wished for his friends to take this and other personal property like his sunglasses, or whether Kokesh chose to maintain possession.

[10] With a few exceptions not relevant this case, Louisiana law provides that "[n]o person shall stop, park, or leave standing any unattended vehicle on any state highway

No. 20-30356

off with Gizzarelli, and Curlee took Kokesh to the LSP station, where he was later taken to jail.

From these facts, to recap, it is clear that the defendant, LSP Trooper Kevin Curlee: (1) observed a handicap-plated truck after nightfall stopped on the shoulder of the road high atop the Carrollton Interchange on the Pontchartrain Expressway, part of the interstate system in New Orleans, Louisiana; (2) stopped to investigate the many possible circumstances as to why the truck was stopped, including vehicle breakdown, criminal activity, and motorist assistance; (3) as part of the investigation, and based upon the odd answers given by the three men in the truck, sought the identification of each; (4) noted that, although two men, including the truck's driver, complied, Kokesh remained intransigent, refused to comply, and videotaped the encounter; (5) continued his investigation with one man still handcuffed, although hampered because Kokesh continued his lack of cooperation, attempted to assert his *Miranda* rights though he had not been arrested, and refused to show identification to an officer lawfully investigating potential defacement of public property and why the truck was stopped at such a dangerous place on the elevated expressway at night; (6) arrested Kokesh because of his failure to provide identification; (7) completed his investigation by determining that the two other men in the truck were acting on Kokesh's instructions; and (8) decided Gizzarelli should be uncuffed and released, photographed the product of the pressure spray stencil on the overpass wall and pressure washing equipment, and wrote a ticket to Evans, the truck's driver, for illegally stopping on the interstate shoulder. According to Curlee's narrative, he arrested Kokesh for "Resisting an officer—not providing identification" in violation of Louisiana law, which requires a

---

shoulder, unless such stopping, parking, or standing is made necessary by an emergency . . . ." LA. R.S. 32:296(A).

10

lawfully detained person "to give his name and make his identity known to the arresting or detaining officer." LA. R. S. 14:108(B)(1)(c).

Kokesh sued Curlee, the Superintendent of the Louisiana State Police, and the Orleans Parish District Attorney for (1) false arrest, (2) false imprisonment, (3) kidnapping, (4) battery, (5) malicious prosecution, (6) intentional infliction of emotional distress, (7) unreasonable seizure and excessive force under the Fourth Amendment, and (8) retaliation under the First Amendment. After a series of motions to dismiss, the district court dismissed all claims for injunctive and declaratory relief, all official-capacity claims, and all state law claims. The only remaining claims at that point were the 42 U.S.C. § 1983 claims against Curlee in his individual capacity for unreasonable seizure and excessive force under the Fourth Amendment, and retaliation under the First Amendment. Curlee moved for summary judgment on these claims, in part based on qualified immunity. The district court granted the motion as to the excessive-force claim but denied it as to the unreasonable-seizure claim and the claim for First Amendment retaliation. Curlee timely brought this interlocutory appeal, challenging the district court's denial of qualified immunity.

## II.

District court orders denying summary judgment on the basis of qualified immunity are immediately appealable and reviewed *de novo* only if they are predicated on conclusions of law and not genuine issues of material fact. *Naylor v. Louisiana*, 123 F.3d 855, 857 (5th Cir. 1997). "This means that the district court's finding that a *genuine* factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal." *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010) (emphasis in original). "Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared

to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). This Court is essentially reviewing the district court's decision that a "certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman*, 493 F.3d at 411.

Qualified immunity shields public officials "sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes qualified immunity, it affects our jurisdiction in two ways—"we review earlier than we otherwise would, and we review less than we otherwise would." *Id.* at 330. As to the expedited timing of our review, defendants who unsuccessfully assert the qualified-immunity defense pretrial can bring an interlocutory appeal, even though denials of summary judgment are not generally final, appealable orders under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985); *see also Plumhoff v. Rickard*, 572 U.S. 765, 771–72 (2014).

As to the scope of our review, it is circumscribed. In a typical summary-judgment case, we review the district court's analysis *de novo*, asking the same question that the district court did—whether the movant has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). But in reviewing the denial of qualified immunity, we accept the district court's

determination that there are genuine fact disputes. *See Melton v Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) ("[W]e lack jurisdiction to review the *genuineness* of a fact issue but have jurisdiction insofar as the interlocutory appeal challenges the *materiality* of [the] factual issues.") (quoting *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016)). And we ask only "whether the factual disputes that the district court identified are *material* to the application of qualified immunity." *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018).

We apply that materiality analysis to both questions that arise when an official invokes qualified immunity: (1) whether the defendant violated the plaintiff's constitutional or statutory rights; and (2) whether those rights were clearly established at the time of the violation "such that the officer was on notice of the unlawfulness of his or her conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111 (2020).

"Whether an official's conduct was objectively reasonable [in light of the law that was clearly established at the time of the disputed action] is a question of law for the court, not a matter of fact for the jury." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). But, "in certain circumstances where 'there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question.'" *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (quoting *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993)); *see also McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000) (if the court has not decided the issue prior to trial, "the jury . . . determine[s] the objective legal reasonableness of the officers' conduct").

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown*, 623 F.3d at 253. Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once it is properly

raised. *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019). The plaintiff has the burden to point out clearly established law. *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019). The plaintiff also bears the burden of "raising a fact issue as to its violation." *Delaughter v. Woodall*, 909 F.3d 130, 139 (5th Cir. 2018)). Thus, once the defense is invoked, "[t]he plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct" according to that law. *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

At the summary judgment stage, however, all inferences are still drawn in the plaintiff's favor. *Brown*, 623 F.3d at 253. This is true "even when . . . a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Likewise, "under either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657; *see, e.g., Tarver v. City of Edna*, 410 F.3d 745, 754 (5th Cir. 2005) (dismissal at summary judgment phase inappropriate because determining whether officer's conduct was objectively unreasonable in light of clearly established law required factfinding and credibility assessments).

When evaluating a qualified immunity defense, courts "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam); *see also Cole*, 935 F.3d at 456 ("[W]e consider only what the officers knew at the time of their challenged conduct."). "Facts [that] an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam);

*Brown*, 623 F.3d at 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight.").

"Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Clarkston*, 943 F.3d at 993 (quoting *Delaughter*, 909 F.3d at 139).

Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). It likewise "shields an officer from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [the officer] confronted." *Brosseau*, 543 U.S. at 198; *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). In short, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks and citation omitted).

Consequently, "[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officer] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officer did]." *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 116 (2020) (emphases omitted); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The precedent must be clear enough that every reasonable official would interpret it to establish the

particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know.") (citations omitted).

## III.

On appeal, the parties do not dispute the district court's determination that the initial traffic stop and detention were valid.[11] The remaining issue is whether the continued detention and subsequent arrest of Kokesh were objectively unreasonable in light of clearly established law at the time of the arrest.

### A.    Fourth Amendment Claim

Relying on *Johnson v. Thibodaux City*, 887 F.3d 726 (5th Cir. 2018), Kokesh argues that, as in *Johnson*, he was simply a passenger in a vehicle that was lawfully stopped but who himself was not suspected of criminal wrongdoing. Further, Kokesh contends that Curlee began to demand identification only when he noticed Kokesh recording him, which is a protected activity under the First Amendment. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (holding that the First Amendment protects "the right to record the police"). Even viewing the facts in a light most favorable to Kokesh, we disagree.

The centerpiece of Kokesh's argument is the recent *Johnson* case. In *Johnson*, Jackalene Johnson, Dawan Every, and Kelly Green were passengers in a truck driven by Latisha Robertson. A Thibodaux Police Department officer recognized Robertson as the subject of an outstanding warrant. He had

---

[11] It is undisputed that the pickup truck stopped atop the Pontchartrain Expressway voluntarily, apparently at the insistence of Kokesh. Curlee's arrival at the scene did not initially effectuate a *Terry* stop, but it is also undisputed that, when he exited his LSP unit and commenced his investigation, it soon became a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968).

no other probable cause or reasonable suspicion to stop the truck except his recognition of Robertson. The officer effected a *Terry* stop, asked Robertson to exit the truck, and handcuffed her once she did. Thus, the purpose of the *Terry* stop was accomplished, and the lawful detention of the other occupants of the vehicle, none of whom were known to the officer, had concluded. Our court reasoned:

> The city maintains that Johnson was lawfully detained because Amador [the officer] had a valid justification for the initial traffic stop: to arrest Robertson on an outstanding warrant. We disagree.
>
> When the police stop a vehicle and detain the occupants, they have effected a Fourth Amendment "seizure." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). We treat those traffic stops as *Terry* stops. *Id.* Our *Terry* analysis has two parts. First, we assess whether the initial stop was justified. *Id.* As the city demonstrates, the initial stop was justified to arrest Robertson, who had an outstanding warrant.
>
> Second, we determine whether "the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* The "touchstone" here is "reasonableness," which "eschews bright-line rules [and] instead emphasiz[es] the fact-specific nature of the . . . inquiry." *Id.* at 507 (quoting *Ohio v. Robinette*, [519 U.S. 33, 39 (1996)]). Hence, we require that an officer's actions after a legitimate stop be "reasonably related to the circumstances that justified the stop, or to dispel[] his reasonable suspicion [that] developed during the stop. *Id.* A reasonable detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.*
>
> Even in the light most favorable to the verdict, the evidence shows that Johnson's detention lasted longer than

> necessary to effect the purpose of the stop. Amador testified that he stopped the truck because he recognized Robertson, knew that she had an outstanding warrant, and planned to arrest her. And Amador quickly effected that purpose.

*Johnson*, 887 F.3d at 733–34. Unlike Kokesh, Johnson was merely a passenger in the truck, said not a word to the officer, and took no action whatsoever prior to the request for identification. In fact, but for the recognition of Robertson as the subject of a warrant, the truck's occupants in *Johnson* were not violating any laws or traffic regulations and would not have been lawfully stopped under those facts.

In order for Kokesh to fall within the scope of *Johnson*, he must demonstrate that Curlee improperly continued and extended a traffic stop for the *sole* purpose of obtaining his identification, without developing "reasonable suspicion, supported by articulable facts" during the justified portion of the stop or must have made the request because of "the circumstances that justified the stop." *Id.* at 734 (citation omitted). Putting aside the undisputed fact that this was not a traffic stop at all, but rather was initiated by the voluntary stop of the truck at the instruction of Kokesh, the evidence does not suggest that Curlee continued or extended his interaction with Kokesh and his supporters unnecessarily and unreasonably. Indeed, as set forth above, articulable facts exist (and are depicted on the bodycam video) to support reasonable suspicion that Kokesh participated in the defacement of public property in violation of LA. R.S. 14:56.4. To that end, Curlee questioned both Evans and Gizzarelli, who both indicated they acted on Kokesh's instructions as to stopping the truck on the elevated Pontchartrain Expressway, exiting the vehicle, and stenciling "freedom" on the overpass wall. Because both Gizzarelli and Evans cited Kokesh's authority, as a presidential candidate and book author, for their acts, further

inquiry was surely in order, and requesting a personal identification from Kokesh was not unreasonable.[12]

Moreover, the actions of Kokesh himself, under these circumstances, also generated reasonable suspicion: without prompting, Kokesh pulled out a card and began reading what would be his *Miranda* rights when Curlee approached. Also, without any request whatsoever to search, Kokesh announced forthrightly that he did not consent to a search of any kind. At that time, Curlee understood that Kokesh was the leader and director of the trio, that he refused to cooperate with the production of identification, and seemed to be under the impression he was being arrested though Curlee made not even an intimation of such intent. These are hardly the circumstances which would warrant a law enforcement officer to return to his LSP unit and drive off into the night. Kokesh's claim therefore fails on the first inquiry of qualified immunity: his constitutional and statutory rights were not violated by Curlee's request for identification or the arrest for failure to comply under LA. R.S. 14:108(B)(1)(c). Accordingly, we need not discuss the second prong, *i.e.*, the clear establishment of such rights at the time of the violation such that the officer was on notice of the unlawfulness of his conduct. *Cole*, 935 F.3d at 451.

---

[12] By contrast, the alternative course of action the dissent insists upon *would* be unreasonable. Indeed, the unforgiving standard urged by the dissent would leave Curlee with little choice but to wish the three gentlemen a nice evening, get in his LSP unit, and drive away into the dark night. In so doing, Curlee still would not have ascertained the true name of the uncooperative person in the passenger seat who was purportedly responsible for such suspicious and unique circumstances. Worse yet, he would have left the scene not yet certain whether he had deserted a kidnapping or illicit transaction in progress, but fully aware that his leaving a parked truck on the shoulder of the dark and narrow Pontchartrain Expressway created a peril not only to the three people at the scene (one a presidential candidate), but to oncoming traffic as well. In such an alternative scenario, Curlee likely would have been considered derelict in his duty and may have found himself on the receiving end of *several* negligence lawsuits, rather than this single § 1983 action.

Kokesh's argument also hinges on two statements made by Curlee on the expressway: (1) during his questioning of Gizzarelli, Curlee stated: "It looks like y'all are spray painting. So if it's not spray paint, that'll be fine."; and (2) "I see it's not paint, which I guess, there's no law against cleaning something." Kokesh argues that the *Terry* stop ended based on these statements, and Curlee's interaction with Kokesh and his supporters should have ceased. In so arguing, Kokesh suggests that Curlee should have then gotten back into his LSP unit and driven off, leaving the trio and the truck atop the elevated expressway to complete their pressure washing stencil.

We disagree. First, Curlee's "that'll be fine" comment was phrased in the conditional and preceded Curlee's investigation into the alleged pressure washing: *if* Curlee confirmed Gizzarelli's representation that the group was pressure washing rather than spray painting, then their actions would not run afoul of any law. Curlee did not confirm Gizzarelli's representation until *after* Kokesh's intransigence and arrest under LA. R.S. 14:108, when Curlee took his second, closer look at the "freedom" stencil with his flashlight, saw the evidence of pressure washing, and observed pressure washing equipment in the bed of the truck. *Only then* did Curlee relay to Evans his conclusion that "it's not paint" and that there was "no law against cleaning something."

Second, Curlee's responsibility to continue to investigate and resolve the situation of a pickup truck stopped on the Pontchartrain Expressway continued until the traffic hazard had been abated. And as previously stated, given the enigmatic answers he received, Curlee may even have been derelict in his duty had he departed with so many open questions. Further, given that, at a minimum, a potential traffic violation had occurred, Curlee continued assessing the situation, and indeed soon thereafter determined that a traffic citation would issue. And so, the detention properly continued. We believe any reasonable officer, faced with these facts, could have continued as did

No. 20-30356

Curlee, and that the scope and length of the detention was thus not excessive, even considering these facts in a light most favorable to Kokesh.

Kokesh maintains that, even if the continued stop was lawful, he as a passenger was not obligated to produce identification, likening his actions to those of Jackalene Johnson. This argument is faulty for several reasons, the first of which is that Kokesh was initially seen outside the truck participating in the pressure washing. Secondly, Kokesh's immediate assertion of his *Miranda* rights, and his pronouncement that he did not and would not consent to any search whatsoever, without any communication with Curlee, save the request for an ID, remains intriguing. A reasonable officer—indeed a reasonable person—would wonder in that moment whether drugs or alcohol had been involved; whether other foul play existed, given that Gizzarelli did not know the name of the truck's driver; whether any of the three men were held against their will; whether Kokesh was wanted or the subject of a warrant, given his steadfast refusal to produce an ID; or what the immediate intentions of the three were, *i.e.*, whether they wished to remain undisturbed pressure washing atop the Pontchartrain Expressway, or whether they would vacate such a precarious position. To leave these concerns unresolved could even seem derelict on the part of a law enforcement officer like Trooper Curlee. The key to the constitutionality of a *Terry* stop is whether reasonable suspicion of criminal activity and whether the officer's investigative efforts were "likely to confirm or dispel [his] suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Curlee's actions reasonably fall within the effort to confirm or dispel his suspicions regarding the three men on the elevated expressway.

## B.    First Amendment Retaliation Claim

Kokesh claims that Curlee retaliated against him for exercising his First Amendment right, which resulted in his arrest. When asserting a claim

No. 20-30356

for retaliatory arrest, a plaintiff must first establish the absence of probable cause, and then demonstrate that the retaliation was a substantial or motivating factor behind the arrest. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019). In making this claim, Kokesh alleges that his use of a cell phone to record Curlee's activities on the expressway was the cause of Curlee's actions in demanding to see Kokesh's ID and ultimately his arrest. Specifically, Kokesh cites Curlee's comment upon noticing Kokesh's camera: "Is this what y'all do? Videotape the police?"[13]

Kokesh's allegations that Curlee's actions were driven by seeing Kokesh video recording the encounter are frivolous. Indeed, Curlee was well aware that his conduct and verbiage was being recorded for posterity where all could view, examine, and second guess each and every second because he purposefully turned *his* bodycam on, and left it on for hours during the time he was with Kokesh. It therefore makes no sense that Curlee was angered, incensed, or motivated by resentment upon seeing Kokesh holding his recording cell phone.

---

[13] Kokesh also takes offense at Curlee's later comments, while they were seated together in Curlee's LSP unit. Although he earlier asserted his "right" to remain silent and refused to show his ID, Kokesh began questioning Curlee, who responded: "I don't come out here to play games, bro. Oh, serious games like the one you were playing? You don't know what I do, bro. I do this for a living. I can't hear you. You don't need to talk no more, bro." Curlee's response, however, makes no specific reference to video recording. And the "serious games" could likely include pressure washing stenciled words; stopping along a busy elevated expressway; leaving messages on public property; asserting *Miranda* rights, including off a prewritten card, when not arrested; and refusing to produce identification when asked. This statement is of no help to Kokesh's First Amendment claim for retaliatory arrest, because it does not reference the video recording, and more importantly, was made *after* the arrest had already occurred.

No. 20-30356

Moreover, Curlee not once instructed Kokesh to cease the video recording, nor did he try to obstruct Kokesh's camera lens. Curlee did not voice any objection to the video recording (no doubt because his bodycam was also recording), nor did he ask either Evans or Gizzarelli to prevail upon Kokesh to stop recording. Once Kokesh was arrested, Curlee did not destroy or delete the video recording, nor did he ask Kokesh's companions to do so. He did not even seek to stop the recording himself by grabbing the phone. In fact, Curlee offered Kokesh the option of either keeping his cell phone (which contained the existing recording and was even then recording or capable of continuing to record into the future), or putting it in possession of Evans and/or Gizzarelli for safekeeping. In front of Curlee, Kokesh gave the phone to Evans. These acts are hardly evidence of a state trooper angry over the video recording of his actions. Rather, they suggest the opposite.

Kokesh also argues that Curlee's unreasonable detention is evidenced by the fact that Curlee never asked Kokesh what his name was, and that Curlee already knew his name because Evans disclosed it. But it takes no amount of law enforcement training to know that a person, particularly one with something to hide, might logically give a false name or alias. And law enforcement officers are not bound to accept a third person's identification of a companion, particularly in circumstances where a false identification would benefit one seeking to evade the police anyway. Seeking and relying upon an official means of identification, like an authorized current driver's license, is far superior to word-of-mouth unverified identification from a third party, especially since it had already been established that one of the trio (Gizzarelli) did not know the name of the other (Evans).

## IV.

Citizens have long-cherished constitutional rights which deserve our protection. Law enforcement officers have difficult but necessary jobs which

23

deserve our cooperation and respect. Under the facts presented here, this appears to be a regular investigation of an extraordinary and hazardous situation created voluntarily by the plaintiff himself, and this officer's conduct appears to be in accord with reasonable expectations as the encounter unfolded. The Fourth Amendment and 42 U.S.C. § 1983 should not be employed as a daily quiz tendered by videotaping hopefuls seeking to metamorphosize law enforcement officers from investigators and protectors, into mere spectators, and then further converting them into federal defendants. Based upon the facts as alleged by Kokesh and represented on Trooper Curlee's bodycam, the denial of summary judgment on qualified immunity is REVERSED and the case is REMANDED to the district court for entry of summary judgment in favor of Trooper Curlee.

No. 20-30356

DON R. WILLETT, *Circuit Judge*, dissenting:

This is a strange case, even by New Orleans' standards.[1] Maybe the utter weirdness of it all—a midnight meeting between a police officer, a pressure washer, and a presidential candidate—explains the majority's grant of qualified immunity: What was an officer to do? Even so, the key facts are sharply disputed, even if their oddness is not. Accordingly, I believe the district court got it right: A jury of Trooper Curlee's peers should decide if he acted constitutionally—not us.

Respectfully, the majority missteps in various ways: (1) peeking outside the record to assess the history and characteristics of the Carrollton Overpass and its purported dangers; (2) speculating about Trooper Curlee's concerns when he arrived on the scene[2] and venturing conclusions about Curlee's reasonableness[3] and Kokesh's blameworthiness;[4] and (3) exceeding our jurisdictional limits by collaterally attacking the district court's genuineness findings under the guise of materiality.

I respectfully dissent.

---

[1] Anthony Bourdain, the globe-trotting chef, author, and travel documentarian put it well: "There is no other place on earth even remotely like New Orleans. Don't even try to compare it with anywhere else." ANTHONY BOURDAIN & LAURIE WOOLEVER, WORLD TRAVEL: AN IRREVERENT GUIDE (2021) (ebook).

[2] *Ante* at 4.

[3] *E.g.*, *ante* at 4 ("Reasonably finding such conduct (defacing public property) to be suspicious (not to mention dangerous), Curlee demanded that the man overseeing the spraying get back in the front passenger seat of the truck."); *ante* at 6 ("At this point, under any objective measure, Curlee surely was required to go further, based on his experience and the puzzling nature of [Gizzarelli's] response.").

[4] *Ante* at 7 ("Given the strange circumstances Kokesh created, Curlee then wisely summoned a back-up trooper to assist.").

No. 20-30356

I

Just before midnight on January 2, 2019, Trooper Curlee saw a truck stopped on the shoulder of the Carrollton Overpass on Interstate 10 in New Orleans. Trooper Curlee pulled over behind the truck, as Louisiana law prohibits leaving "unattended vehicle[s] on any state highway shoulder, unless such stopping, parking, or standing is made necessary by an emergency."[5] Trooper Curlee, with his bodycam on, approached the vehicle and observed Adam Kokesh standing by the truck and Elijah Gizzarelli spraying the highway overpass wall.[6] Trooper Curlee told Kokesh to get back in the truck and instructed Gizzarelli to come towards him. Trooper Curlee immediately put Gizzarelli in handcuffs.

Trooper Curlee asked Gizzarelli whether he was spray painting the wall. Gizzarelli said no and explained that he was pressure washing the word "freedom" into the dirt on the wall to promote a book "that's being delivered to every household in New Orleans." Trooper Curlee inquired about weapons in the vehicle, and Gizzarelli said that he was unaware of any. Trooper Curlee then saw Kokesh recording the encounter from the truck and said, "Is this what y'all do? Trying to get attention?" Gizzarelli described how the group had done research to make sure pressure washing the wall was lawful and that they had already pressure washed two other locations. Trooper Curlee then told Gizzarelli: "It looks like y'all are spray painting, sir. If it's not spray paint, that'll be fine." Trooper Curlee recommended that they not pressure wash anywhere else because another law enforcement officer might also mistakenly think that they were spray painting.

---

[5] LA. R.S. 32:296(A).

[6] The remaining facts in this section all come from the bodycam video.

Trooper Curlee's bodycam was active during his nearly three-minute interview with Gizzarelli. It shows that they stood only about a car's length away from the highway wall that Gizzarelli had just pressure washed. It shows that ambient light from headlights and streetlights continuously lit up the wall. And it even shows details about what the wall looked like from that vantage point. The bodycam shows a slightly darkened, circular patch of wall. The darkened patch extended downward from the wall and on to the street. On the street, the patch culminated in a semi-circle of darkened asphalt. In other words, the bodycam captured what appears as a wall that had been sprayed with water, with the excess water having flowed downward and pooling at the wall's base. Drilling down to the patch itself, the bodycam also shows its internal details. It shows apparent lettering inside the darkened patch. And that lettering appears slightly lighter in color than the apparently dry wall itself.

Trooper Curlee then approached the truck. Once he was only a few feet away, he shone a bright flashlight onto the highway wall and left it there to linger for about two seconds. In the center of its light the word "FREEDOM!" clearly appears in the bodycam, its lettering distinctly lighter than the rest of the concrete but revealing no paint. And surrounding the lettering, the bodycam shows, was wet concrete. Trooper Curlee then moved to the driver's side of the truck and commanded the driver to get out. The driver didn't respond. Trooper Curlee asked Gizzarelli who was driving the car, and Gizzarelli replied: "I'm not 100% sure of his name to be honest . . . . He's a friend." Trooper Curlee again asked the driver to exit the vehicle; the driver complied. Trooper Curlee asked for the driver's identification papers, and the driver said it was still in the car. As the driver walked toward the car, Trooper Curlee followed him and saw Kokesh in the front passenger seat. Kokesh was still recording the events on his cellphone.

No. 20-30356

Trooper Curlee repeatedly asked Kokesh for his identification papers. Kokesh refused each time.

Trooper Curlee called for backup. He relayed that a couple of people were in the truck, it "looked like they were spray painting," and one of the passengers wasn't cooperating. After asking the driver about Kokesh's identity, the driver provided Kokesh's full name. The driver also explained that Kokesh was a Libertarian candidate for President of the United States, and the book promotion efforts were campaign activities. Trooper Curlee got in his patrol car and ran Kokesh's name on the computer. Trooper Curlee turned off the mic on his bodycam and stayed in his car for several minutes until a backup officer arrived.

The backup officer and Trooper Curlee approached Kokesh, who was still sitting in the front passenger seat of the truck and recording the encounter on his phone. After again asking for Kokesh's identification papers, and Kokesh again refusing to provide it, Trooper Curlee stated that "the reason we are out here is because y'all are illegally stopped on the shoulder of the road." Trooper Curlee then warned Kokesh that Kokesh could either provide identification papers or be put in handcuffs. Kokesh asked what he would be charged with. And Trooper Curlee responded: "Interfering with the investigation." Kokesh asked how he was interfering, and Trooper Curlee put him in handcuffs without answering the question. One of Kokesh's companions (it's unclear from the video which one) stated that Kokesh was being arrested for interfering with an investigation about the truck being illegally stopped on the highway shoulder. Kokesh then asked Trooper Curlee if that was an accurate description. Trooper Curlee replied: "Something like that. I'll let you know for sure in just a little bit." The backup officer placed Kokesh into the backseat of Trooper Curlee's patrol car. Trooper Curlee removed Gizzarrelli's handcuffs, then walked over to

where the pressure washing had occurred, inspecting the word "FREEDOM!" on the wall.

After taking pictures, Trooper Curlee spoke again with the truck's driver. He asked whether Kokesh had a wallet in the car. As the driver was looking for Kokesh's wallet, he mumbled that he shouldn't have stopped the car on the highway shoulder for the other men to do the pressure washing. The driver handed Trooper Curlee the wallet. Trooper Curlee then told the driver: "I see that it's not paint, which I guess there's no law against cleaning something."

Back in his car, Trooper Curlee pulled out Kokesh's identification papers from the wallet the driver had retrieved. Only Trooper Curlee's voice is audible on the video at this point. In response to something Kokesh asks from the backseat, Trooper Curlee says: "Like I said, I don't come out here to play games, bro. Oh, serious games like the one you were playing? You don't know what I do, bro. I do this for a living. I can't hear you. You don't need to talk no more, bro."

Trooper Curlee then got out of his patrol car to chat with the backup officers (a third officer had arrived at some point), Gizzarelli, and the driver. Once Trooper Curlee got back in his patrol car, Kokesh started speaking with him again. Trooper Curlee responded: "Because you told your buddy to pull over on the side of the road, he's going to get a ticket for that." After writing the ticket and giving it to the driver, Trooper Curlee drove Kokesh to the police station.

In his arrest narrative, Trooper Curlee wrote that he initially pulled over because he thought the truck "was broken down." He then explained that he saw two of the truck's occupants "us[ing] a pressure washer to clean the area that the stencil was not covering," and that "[a]fter removing the stencil, the word 'FREEDOM' remained on the wall." Trooper Curlee

No. 20-30356

stated that he thought "they were painting on the wall," so he "detained the left rear passenger" who he thought was the driver. Trooper Curlee recounted how he spoke with the driver and then saw Kokesh recording the incident on his phone. According to Trooper Curlee's narrative, he arrested Kokesh for "Resisting Arrest—Not providing identification" in violation of a Louisiana law, which requires a lawfully detained person "to give his name and make his identity known to the arresting or detaining officer."[7]

## II

I agree with the majority's rendition of what happened next. Kokesh sued, and a flurry of dismissal motions followed. Just two claims survived: an unreasonable-seizure claim under the Fourth Amendment and a retaliatory-arrest claim under the First. Trooper Curlee then moved for summary judgment based on qualified immunity. The district court said no, and Kokesh's claims survived—until today.[8]

According to the majority opinion, Kokesh should have known better than to have sued in the first place. "The Fourth Amendment and 42 U.S.C. § 1983 should not be employed as a daily quiz tendered by videotaping hopefuls seeking to metamorphosize law enforcement officers from investigators and protectors, into mere spectators, and then further converting them into federal defendants."[9] With greatest respect, I don't know what any of that means. Maybe that is why I don't understand how, on these hotly contested facts, the district court got this case wrong.

---

[7] La. R.S. 14:108(B)(1)(c).

[8] *Ante* at 11, 24.

[9] *Ante* at 24.

No. 20-30356

We are reviewing the district court's denial of Trooper Curlee's immunity-based motion for summary judgment. In that context, the majority opinion correctly states how we should review this case. Trooper Curlee's immunity defense turns on two questions: (1) did he violate Kokesh's federal rights; and (2) were those rights clearly established at the time?[10] If we can answer "yes" to both questions, then the district court got it right and Kokesh's claims should go to a jury. But in answering these questions we are "circumscribed" in our review.[11]

Specifically, denial of summary judgment is an interlocutory order.[12] And under our prior decisions, we lack jurisdiction to review *genuineness*— whether the district court correctly found a particular fact dispute genuine.[13] We are precedentially hemmed in. Our analysis centers on one thing: whether the fact disputes identified by the district court are *material*.[14] And a fact dispute is material anytime its resolution "might affect the outcome of the lawsuit."[15] That bears repeating: if it *might* affect the outcome. Moreover, inferences must be drawn in Kokesh's favor, not Trooper Curlee's.[16] The only facts that matter are those that Trooper Curlee knew at or before the

---

[10] *See ante* at 13 (citing *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111 (2020)).

[11] *Ante* at 13.

[12] *In re Corrugated Container Antitrust Litig.*, 694 F.2d 1041, 1042 (5th Cir. 1983) (per curiam).

[13] *Ante* at 12–13 (citing *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc)).

[14] *Ante* at 13 (citing *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018)).

[15] *Prim v. Stein*, No. 20-20387, slip op. at 2 (5th Cir. July 27, 2021) (quoting *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

[16] *Ante* at 14 (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

31

time that he arrested Kokesh. Those he learned later are immaterial.[17] And we must be careful with facts in another regard. We cannot define this case's factual "context" by construing genuinely disputed facts in Trooper Curlee's favor.[18] Again, we must view the evidence in the light most favorable to Kokesh.[19]

Respectfully, the majority opinion rightly states these principles but wrongly applies them. The district court properly found genuine disputes of material fact as to whether Trooper Curlee violated Kokesh's First and Fourth Amendment rights. And because applicable law was clearly established at the time of Kokesh's arrest, the district court properly denied summary judgment.

## III

The Fourth Amendment guarantees "the people" freedom from "unreasonable searches and seizures" of both their "persons" and their "*papers*."[20] We have noted before that, generally, Fourth Amendment seizures are unreasonable without supporting probable cause.[21] The majority says that Trooper Curlee had probable cause to arrest Kokesh. Invoking Louisiana's stop-and-identify law, the majority holds that Trooper Curlee had probable cause to arrest Kokesh for "resisting an officer by refusing to

---

[17] *Ante* at 14 (citing *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam); *White v. Pauly*, 137 S. Ct. 548, 550 (2017); *Cole*, 935 F.2d at 456)

[18] *Ante* at 14 (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)).

[19] *Tolan*, 572 U.S. at 657.

[20] U.S. Const. amend. IV (emphasis added).

[21] *E.g. United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir. 1993) ("The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." (citation omitted)).

identify himself during a lawful detention."[22] Indeed, the police charged Kokesh with only this offense. By contrast, the district court found that fact issues abounded on this issue, making summary judgment inappropriate. I agree.

## A

Arresting someone under a stop-and-identify law is constitutionally dubious. That's because the Supreme Court held in *Hiibel v. Sixth Judicial District Court of Nevada* that it offends the Constitution to arrest someone under these laws merely for failing to identify himself.[23] Two things must be true before an officer may constitutionally make an arrest under a stop-and-identify law: (1) the initial stop must have been lawful (that is, with at least reasonable suspicion); and (2) the "request for identification" must be "reasonably related to the circumstances justifying" it.[24] The district court found a genuine fact dispute under each prong.

### (1)

As for *Hiibel*'s first prong, the district court found a fact issue regarding "whether Curlee had reasonable suspicion supported by articulable facts that Kokesh had engaged in criminal activity or was about to do so." The entire case boils down to this issue. Trooper Curlee must have *lawfully* seized Kokesh *before* he could constitutionally demand identification papers.[25] As the majority admits, a *Terry* stop's constitutionality turns on the

---

[22] *Ante* at 7–8 (footnote omitted); *see also* LA. R.S. 14:108(B)(1)(c) (criminalizing as resisting an officer the "[r]efusal by the arrested or detained party to give his name and make his identity known to the arresting or detaining officer.").

[23] 542 U.S. 177, 188 (2004).

[24] *Id.* at 188 (emphasis added).

[25] *Hiibel*, 542 U.S. at 188.

officer having "reasonable suspicion of criminal activity."[26] That means, in the Supreme Court's words, that Trooper Curlee had to "point to specific and articulable facts" that, "taken together" with their "rational inferences," would warrant a reasonably cautious person to believe that Kokesh was involved in "criminal activity."[27] If Trooper Curlee can do so, then he could have constitutionally demanded Kokesh's identification papers. If he cannot, then he may have violated Kokesh's clearly established rights. This is the very fact dispute that the district court found. And because it *might* affect the outcome of Kokesh's Fourth Amendment claim, it is material.

But the majority opinion improperly rejects that finding. It holds that the bodycam demonstrates that Trooper Curlee had "reasonable suspicion that Kokesh participated in the defacement of public property."[28] I'll admit that the bodycam shows Kokesh out of the truck and standing next to Gizzarrelli when Trooper Curlee first arrived. But reasonable suspicion does not persist forever. It lasts only for the "time needed" to dispel it.[29] And when Trooper Curlee dispelled it is the central question in this case. Did he dispel it *before* he demanded Kokesh's identification papers, or after? The majority opinion says that Trooper Curlee did not "confirm" that Kokesh and the gang were not using spray paint until his "second, closer look at the

---

[26] *Ante* at 21 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

[27] *Terry v. Ohio*, 392 U.S. 1, 21–22, 30 (1968) (citation omitted).

[28] *Ante* at 18.

[29] *United States v. Pack*, 612 F.3d 341, 350 (2010); *see also Sharpe*, 470 U.S. at 686 (considering "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").

'freedom' stencil."[30] In other words, *after* Trooper Curlee arrested Kokesh. Tucked away in the majority opinion's fact section is its reasoning why Trooper Curlee's first look at the stenciling—the one he took before ever demanding Kokesh's identification papers—did not dispel his reasonable suspicion. Trooper Curlee, in the majority opinion's words, only "briefly shined his flashlight . . . onto the site of the alleged pressure washing."[31] Further, the "distance" between Trooper Curlee's vantage point and the "darkness of the night" made it "unclear" if Gizzarelli had been using "white paint or a pressure washer."[32]

What was clear or unclear from Trooper Curlee's vantage point given the context of this case sure sounds like an inference to me. The majority opinion admits that Trooper Curlee used his flashlight during his first inspection of the stenciling. But then it infers *against* Kokesh that the inspection was too brief, from too far away, and in too-dimly-lit conditions to confirm that no spray paint was being used. I disagree. As noted above, the bodycam shows that the highway wall was illuminated by headlights and streetlights to such a degree that the stenciling was visible even without the aid of a flashlight. Also, Trooper Curlee used his flashlight to inspect the stenciling for about two full seconds. In that time the bodycam plainly shows not a spray-*painted* wall but a spray-*washed* wall. That is enough for us to draw an inference in Kokesh's favor that Trooper Curlee dispelled his reasonable suspicion during his first inspection. This is why a jury should decide this issue.[33]

---

[30] *Ante* at 20.

[31] *Ante* at 5.

[32] *Ante* at 6.

[33] Failing to draw inferences correctly has resulted in our reversal before. In *Tolan v. Cotton* the district court granted an officer's immunity-based motion for summary

No. 20-30356

The majority opinion next introduces a grab-bag of reasons why Trooper Curlee had reasonable suspicion or some other justification to demand Kokesh's identification papers. It claims that Trooper Curlee had reasonable suspicion that maybe "drugs or alcohol had been involved," "foul play existed," some "of the three men were held against their will," or "Kokesh was wanted or the subject of a warrant, given his steadfast refusal to produce an ID."[34] Boiled down, the trio's "immediate intentions" were unknown to Trooper Curlee.[35] But if any *record evidence* supports that Trooper Curlee suspected any of these supposed crimes, the majority opinion has failed to identify it. In fact, these are just more of the same *ex post* rationalizations that the majority opinion uses throughout. And as I explain more thoroughly below, by rationalizing Trooper Curlee's actions the majority opinion draws inferences the wrong way and exceeds our jurisdiction to boot. And the rationalizations are rather feeble at that. Even assuming that some or all of them amount to crimes,[36] reasonable suspicion requires *articulable facts*. A *hunch* that a suspicious-looking character surely must be violating some law in some criminal code somewhere is not good enough.[37]

---

judgment after he shot a prostrate teenager lying on his parent's front porch. 572 U.S. 650, 652–53, 655 (2014). A panel of this court affirmed because it credited the officer's version of events (that the teenager was shrouded in darkness) over the teenager's and his father's version (that the teenager was not). *Id.* at 657–58. The Supreme Court reversed, holding that we had "failed to view the evidence at summary judgment in the light most favorable to the" non-movant teenager. *Id.* at 657. Admittedly, *Tolan* did not involve video evidence. But it does drive home how we must view the evidence we do have in these cases: in the light most favorable to the non-movant.

[34] *Ante* at 21.

[35] *Ante* at 21.

[36] If they do, the majority opinion fails to provide citations for them.

[37] *Terry*, 392 U.S. at 22.

The majority also seems to conflate Fourth Amendment doctrines. It says that Trooper Curlee had a "responsibility to continue to investigate and resolve the situation of a pickup truck stopped on the Pontchartrain Expressway . . . until the traffic hazard had been abated."[38] While the majority opinion does not label it as much, what it is implying is that Trooper Curlee's power under the police's community-caretaking function could constitutionally trigger Louisiana's stop-and-identify law. Not so. I'll concede what the Supreme Court has made plain: "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."[39] But leaving aside that Kokesh was neither the truck's driver nor its owner, the Supreme Court has also said that stop-and-identify laws are predicated on an officer having at least reasonable suspicion of criminal activity—in other words, the police's criminal-investigation function.[40] Those two functions—community caretaking and criminal investigation—are "total[ly] divorced" in the Supreme Court's eyes.[41] And the majority opinion cites no caselaw suggesting they've since remarried. So Trooper Curlee may have had authority to order Kokesh and crew to leave the highway shoulder under the community-caretaking function. But that authority did not extend so far as to

---

[38] *Ante* at 20.

[39] *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

[40] *See Hiibel*, 542 U.S. at 188 ("[A] *Terry* stop must be justified at its inception and 'reasonably related in scope to the circumstances which justified' the initial stop. Under these principles, an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop.").

[41] *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

No. 20-30356

provide a lawful justification to demand Kokesh's identification papers as part of a criminal investigation.[42]

Finally, the majority emphasizes how Kokesh "began reading what would be his *Miranda* rights when Curlee approached" and "without any request whatsoever to search . . . announced forthrightly that he did not consent to a search of any kind."[43] The majority holds that these "actions" by Kokesh, "under these circumstances, also generated reasonable suspicion."[44] Respectfully, this is a dagger to the heart of the Fourth Amendment.

Simply put, holding that an officer can form a reasonable suspicion because a person anticipatorily invoked his constitutional rights[45] creates a "Catch-22"[46] of constitutional proportions. Police are free to approach

---

[42] That the community-caretaker function cannot trigger Louisiana's stop-and-identify law is also why the majority opinion errs in judicially noticing facts about the Carrollton Overpass. It holds that Federal Rule of Evidence 201(b)—the rule about judicial notice—gives it authority to do so. *See ante* at 2, n.3. Not so. As I just explained, it uses these facts to implicitly and erroneously hold that Trooper Curlee's role as a community caretaker could trigger Louisiana's stop-and-identify law. Without any other purpose these judicially noticed facts are not "of consequence in determining the action." FED. R. EVID. 401. In other words, they aren't "relevant" under Rule 401, making them inadmissible. *See* FED. R. EVID. 402 ("Irrelevant evidence is not admissible."); *see also Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015) (discussing the district court noticing "relevant facts"). Therefore, judicial notice is improper.

[43] *Ante* at 19.

[44] *Ante* at 19; *see also ante* at 21 ("A reasonable officer—indeed a reasonable person—would wonder in that moment whether drugs or alcohol had been involved; [or] whether other foul play existed . . . .").

[45] I agree with the majority, *see ante* at 19, that Kokesh's anticipatory invocation of *Miranda* was ineffective. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' . . . .").

[46] *See* JOSEPH HELLER, CATCH-22 46 (Paperback ed., Simon & Schuster 2004) (1955) ("[C]oncern for one's own safety . . . was the process of a rational mind. Orr was

individuals and ask questions, ask for identification, or even ask to conduct a search. They may do it with no suspicion at all.[47] What keeps these pre-reasonable-suspicion requests constitutional? Police cannot require compliance.[48] Individuals are free to "decline the officers' requests or otherwise terminate the encounter."[49] But under the majority's view, there's a catch. As of today, if a vehicle passenger invokes his right not to comply with an officer's pre-reasonable-suspicion requests, then that gives the officer what he lacks: reasonable suspicion. Add in a stop-and-identify statute like Louisiana's, and an officer now has a constitutional basis to demand identification on pain of arrest. The passenger can avoid arrest only by complying with the officer's request for identification, which, of course, is the very kind of forced compliance that the Fourth Amendment guards against. That cannot be reasonable under the Constitution.[50] And that may explain why the majority cites no supporting caselaw.

(2)

As for *Hiibel*'s second prong, the district court found a fact issue regarding "whether Curlee's demand that Kokesh provide documentary identification was reasonably related in scope to the reason for the traffic stop." If Trooper Curlee's request for Kokesh to identify himself related reasonably to the stop, then Kokesh's claim might fail. But if it did not, then

---

crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions.").

[47] *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) (citations omitted).

[48] *Id.* at 435.

[49] *Id.* at 436.

[50] U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

Kokesh's claim might succeed. In short, reasonable relatedness *might* affect the outcome of Kokesh's claim. That makes it material. And that makes summary judgment improper.

The majority opinion, rather than focusing on materiality, implies that Trooper Curlee had probable cause as to some other crime. Like Louisiana's anti-graffiti statute.[51] Or, Louisiana laws relating to operating "portable pressure washing equipment" and unlawfully "discharg[ing] industrial wastewater [on] state highways."[52] Or, using Trooper Curlee's words, "illegally stopp[ing] on the shoulder of the road."[53] But Trooper Curlee does not make these arguments in his brief. And he did not charge Kokesh with them after the fact. Rather, the majority has searched the Louisiana criminal code and *inferred* that Kokesh *might* have been guilty of these crimes.

That is a twofold error. First, as a general matter, Article III judges are not in the business of rummaging through state criminal codes for *ex post* justifications supporting officers' actions. When we do in this context, we are necessarily making inferences *against* the nonmovant. This is precisely what we are forbidden from doing. Second, the majority opinion's reasoning collaterally attacks genuineness. Its implicit logical chain is straightforward: probable cause may have existed for some other crime; it takes probable cause for only one crime to lawfully arrest; thus, a genuine dispute over whether Trooper Curlee lawfully arrested Kokesh cannot exist. *Maybe*.[54] But if we lack

---

[51] *Ante* at 4 n.5 (quoting La. R.S. 14:56.4).

[52] *Ante* at 5 n.6 (citing La. R.S. 30:2075, 30:2076.2, 48:385).

[53] *Ante* at 8; *see also ante* at 9 n.10 (quoting La. R.S. 32:296(A)).

[54] Note that Louisiana courts have already clearly established that the stopping-on-the-highway statute applies only to completely "unattended" vehicles. *Minor v. Bertrand*, 693 So. 2d 292, 294 (La. Ct. App. 1997) ("Under its clear and unambiguous language, La.R.S. 32:296(A) is not applicable. As stated in the statute, its applicability is triggered if the vehicle is unattended."); *see also Hebert v. Maxwell*, 214 F. App'x 451, 455 (5th Cir.

jurisdiction to directly review genuineness then we certainly cannot do it collaterally. Our lone analytical focus is materiality, and we must decide it *solely* on what Trooper Curlee "knew at the time."[55] And what Trooper Curlee knew when he arrested Kokesh is clear from the video: no paint was being used; "there's no law against cleaning something"; Kokesh was not the driver; and he arrested Kokesh for not turning over identification papers on demand.

## B

Putting everything together, only one question remains: Was Kokesh's right to refuse to identify himself clearly established when Trooper Curlee arrested him? It was.

As we have previously noted, a right is clearly established when its contours are sufficiently clear to the point that a reasonable official would understand that his conduct violates it.[56] And as we explained less than a year ago, that means Kokesh need only "identify a case . . . in which an officer acting under similar circumstances was held to have violated the Constitution."[57]

---

2007) (noting that the statue only applies to unattended vehicles). Leaving aside that Kokesh neither owned the truck nor drove it, the video plainly shows the truck was never unattended.

[55] *Ante* at 14 (quoting *Cole*, 935 F.3d at 456).

[56] *Turner v. Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[57] *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (emphasis added) (cleaned up).

That case is *Johnson v. Thibodaux City*.[58] Its facts are straightforward. An officer spotted a truck driving down the road and recognized its driver. The officer knew the driver had an outstanding warrant. So, the officer pulled over the truck, arrested the driver, and then asked the passengers for identification. Two of them, including Johnson herself, refused. The officer arrested them both for failing to identify themselves. He justified the arrest using the very Louisiana stop-and-identify statute at issue in this case.[59] We held that the officer violated Johnson's rights under the Fourth Amendment because the arrest did not meet *Hiibel*'s test.[60] The officer's request for Johnson's identification "had nothing to do" with his justification for stopping the truck.[61] Kokesh's case is similar. He was a passenger in the truck that Trooper Curlee stopped behind. And, as I've already discussed, the district court found genuine fact disputes on both of *Hiibel*'s reasonable-suspicion and reasonable-relatedness prongs. Further, we decided *Johnson* in 2018. Trooper Curlee arrested Kokesh in 2019. Therefore, Kokesh's rights were clearly established when Trooper Curlee arrested him.

The majority opinion erroneously discounts *Johnson*'s applicability.[62] First, it attempts to distinguish the case by again attacking genuineness. The majority says that *Johnson* is inapt since, "[u]nlike Kokesh, Johnson was merely a passenger in the truck, said not a word to the officer, and took no action whatsoever prior to the request for identification."[63] Further, "the

---

[58] 887 F.3d 726 (5th Cir. 2018).

[59] *Id.* at 729–30; *see also id.* at 733 (citing LA. R.S. § 14:108).

[60] *Id.* at 733, 735.

[61] *Id.* at 734.

[62] *See ante* at 18–19.

[63] *Ante* at 18.

truck's occupants in *Johnson* were not violating any laws or traffic regulations" prior to the stop.[64] These are all immaterial distinctions. The touchstone is *similar*. Not *identical*.[65] *Johnson* did not turn on how the officer wound up behind a stopped truck. It turned entirely on the officer lacking reasonable suspicion for the *passenger*—precisely the fact that the district court here found to be genuinely disputed.

That brings me to the second way the majority tries to distinguish *Johnson*. As I've already pointed out, the majority collaterally attacks genuineness by holding that Trooper Curlee had independent reasonable suspicion to request Kokesh's identification papers. And since the officer in *Johnson* did not, voilà—a distinction. But the majority's distinction does not work here. It can find it only after collaterally attacking genuineness *and* drawing inferences against Kokesh. Because we have neither jurisdiction to make our own appellate fact-findings in this context, nor authority under the Federal Rules to draw inferences against Kokesh, I need not address it further.

IV

When it comes to Kokesh's retaliatory arrest claim, Kokesh needed to first establish the absence of probable cause.[66] If he did, then he still had to "show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to

---

[64] *Ante* at 18.

[65] *Juarez v. Aguilar*, 666 F.3d 325, 336 (5th Cir. 2011) ("That this court has not previously considered an identical fact pattern does not mean that a litigant's rights were not clearly established.").

[66] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019).

retaliation."[67] Kokesh claims that "Curlee arrested and seized Kokesh in retaliation for Kokesh's use of a camera to record Curlee's public activities." The district court, for its part, found that fact issues swirled around whether Trooper Curlee had probable cause to arrest Kokesh. And those material disputes precluded summary judgment on Kokesh's First Amendment retaliation claim. I agree.

## A

In *Turner v. Driver*, we held that the "First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions."[68] Suppose that Trooper Curlee had probable cause to arrest Kokesh for a lawful reason. That "should generally defeat" Kokesh's retaliatory arrest claim since it would discount a retaliatory motive.[69] A defense that generally defeats a claim certainly *might* affect its outcome. Therefore, whether Trooper Curlee had probable cause is material to determining if he violated Kokesh's right to record the police.

The majority acknowledges that probable cause goes right to the heart of a First Amendment retaliation claim.[70] But it wires around materiality by doing precisely what it lacks jurisdiction to do: rejecting that this dispute is genuine—in fact, branding it "frivolous."[71] It spends pages building up an inference that Trooper Curlee could not possibly have had a retaliatory

---

[67] *Id.* (cleaned up).

[68] 848 F.3d at 688.

[69] *Nieves*, 139 S. Ct. at 1727.

[70] *Ante* at 22.

[71] *Ante* at 22. *Frivolous* is not a word to be used lightly since it implies sanctionable conduct. *See Conner v. Travis Cnty.*, 209 F.3d 794, 801 (5th Cir. 2000) (per curiam) ("[W]e can sanction an appellant for a frivolous appeal *sua sponte* . . . ."). As far as I can tell, Kokesh's arguments are anything but.

motive. He had already switched on his bodycam.[72] He did not attempt to stop Kokesh from recording him.[73] Plus, Trooper Curlee's insistence on seeing an "official means of identification" from Kokesh was reasonable since only people "with something to hide" would refuse to identify themselves.[74] Perhaps a jury would agree. Perhaps not. And that's the point.

Again, we must draw inferences in Kokesh's favor, not Trooper Curlee's. And here, a jury could infer that "retaliation was a substantial or motivating factor behind the arrest."[75] That's because the first time Curlee saw Kokesh recording a video, he asked Gizzarelli if the men were trying to get attention. Then, as Curlee was demanding to see Kokesh's identification papers, Curlee stated: "Is this what y'all do? Videotape the police?" And Curlee later told Kokesh: "I don't come out here to play games, bro. Oh, serious games like the one you were playing? You don't know what I do, bro. I do this for a living. I can't hear you. You don't need to talk no more, bro." A jury could find a retaliatory motive on these facts.

B

Turning to qualified immunity's second inquiry—whether a constitutional right was clearly established—we did more in *Turner* than simply declare that the right to record police exists. We also cemented that it was clearly established from then on.[76] As *Turner* was decided in 2017 and Kokesh was arrested in 2019,[77] that made Kokesh's rights clearly established

---

[72] *Ante* at 23.

[73] *Ante* at 23.

[74] *Ante* at 23.

[75] *Nieves*, 139 S. Ct. at 1725 (cleaned up).

[76] *Turner*, 848 F.3d at 687–88.

[77] *Ante* at 2.

at the time Trooper Curlee arrested him. Since that's the case, and because there are genuine disputes of material fact as to whether Trooper Curlee violated this right, the conclusion is apparent: Trooper Curlee is not entitled to summary judgment on this claim.

V

The Big Easy does not hide crazy, the saying goes; it parades it down the street. This is a peculiar case, no question. But just because facts are passing strange does not mean government's response to those facts passes muster. Trooper Curlee was not limited to "wish[ing] the three gentlemen a nice evening . . . and driv[ing] away into the dark night."[78] He had a safer, simpler option: ordering Kokesh and crew to beat it.[79] Instead, Trooper Curlee conducted a criminal investigation that arguably violated Kokesh's constitutional rights.

The district court got this case right. Genuine disputes of material fact surround Kokesh's Fourth and First Amendment claims. As odd as this case is, I cannot conclude that Trooper Curlee acted constitutionally. Nor can I conclude the opposite. All I can conclude is that a jury should decide.

---

[78] *Ante* at 19 n.12.

[79] *See Opperman*, 428 U.S. at 369 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.").