# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 14, 2023

Lyle W. Cayce
Clerk

No. 22-30241

_____

Juanita Smith; Floyd Stewart,

*Plaintiffs—Appellees*,

*versus*

J. C. Lee, Officer; City of Shreveport; Corporal Barker,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:19-cv-1261

_____

Before Jones, Smith, and Graves, *Circuit Judges*.
James E. Graves, Jr., *Circuit Judge*:

Defendants Cpl. John Lee and Cpl. Derek Barker appeal the district court's denial of their motion for summary judgment seeking qualified immunity from Plaintiffs' unlawful entry and excessive force claims. We unanimously conclude that Lee and Barker are not entitled to qualified immunity from Smith's unlawful entry claims. Judge Jones and Judge Smith conclude that Lee is entitled to qualified immunity for any force employed from the moment he entered Smith's house, and I dissent in part from that holding. Therefore, we REVERSE in part and AFFIRM in part.

No. 22-30241

# I. Background

## a. Factual Background

On October 4, 2018, the Shreveport Police Department received a tip that a murder suspect, Christian Combs ("Combs"), was hiding at either 1906 State Street or 1913 State Street in Shreveport, Louisiana. The arrest warrant identified Combs as a thirty-three-year-old Black man. Multiple Shreveport Police Department officers, including Defendants Lee and Barker, met to develop a plan to search the two houses. The officers first searched the 1906 State Street home, but they did not find Combs there. The officers then proceeded to 1913 State Street, the home of Plaintiff Juanita Smith ("Smith"). Barker claims that he, Officer Eli Travis, and one of the detectives went to Smith's front door. One of them knocked, and Smith answered. They explained they were looking for Combs when Smith answered the door. Smith told them she did not know Combs.

At this point, Plaintiffs' and Defendants' stories diverge. The officers asked Smith if anyone else was inside the home, and Smith responded no. However, Smith claims she thought they were only asking if Combs was inside. Another officer, Leo Fartaczek, testified that he was at the front of the house with Barker and asked Smith for consent to enter her home. However, in his police report, Fartaczek stated he "took position in the rear of the residence. [Canine Officer] Lee was in the rear with me while Barker made contact with the homeowner, Juanita Smith at the front door." Smith denies that any officer asked her for permission to enter her home. Barker claims he asked Smith to step outside of her home and that she agreed, but Smith claims Barker stepped inside her house to prevent her from going back in. No video or audio exists to confirm or refute what was said or done during this encounter at the front door. Smith ultimately walked out of her house and into her driveway.

No. 22-30241

During this encounter, Lee, a canine officer, was stationed at the back of the house. He was then called to the front of the house. According to Barker, the two of them switched places and Barker took up a position at the rear of the house. Lee claims that on his way to the front of the house, Barker told him they were "good to go." Lee also claims he asked Smith if anyone else was inside the house before entering.

Lee contends that he went to the front door and gave three loud warnings telling anyone inside that a police canine was present and they should come out and identify themselves. During the third warning, he says he warned the dog would enter and bite. Smith said she did not hear any warnings before Lee entered the house. But it is undisputed that Lee entered Smith's home and gave his canine, Dice, the instruction to bite whomever he encountered inside the house. After entering, Dice found Plaintiff Floyd Stewart. According to Lee, he lost sight of Dice when the dog entered the room Stewart was in. Stewart is a Black man who was seventy-eight years old at the time. He was sleeping when he heard noise outside and put his shoes on. When he was leaving the bedroom, Dice bit him. According to Stewart, he could see an officer standing in the hall when Dice first bit him. Lee says that when he heard Dice engage with someone, he proceeded toward the sound, recognized that the person Dice was biting was not Combs, and immediately got Dice to release the bite. According to Stewart, Dice bit him multiple times. He pushed the dog off once, but the dog came back to bite him again. Meanwhile, Stewart claims Lee stood by while Dice was biting him and did not immediately command Dice to stop the attack. Stewart claims the incident lasted at least a minute before Lee commanded Dice to release the bite. As a result of the attack, Stewart sustained puncture wounds and lacerations to his left thumb, left calf, and left thigh.

Lee had a body camera, and he thought he activated it before he entered Smith's home. He said it is department policy for canine officers to

3

activate their body cameras once they get their canines out. However, it was switched on only after Dice bit Stewart. In the footage after the search, Lee asks two of the detectives if they talked to Smith at the door. One of the detectives responds that it was Barker who spoke to her. Lee then asks Barker if he "asked" Smith. Barker responds that he did not, and he does not know if anyone did. At this point, it sounds like Lee responds, "I should have asked her." However, in his deposition, Lee claims he actually said, "*he* [Barker] should have asked her." (emphasis added). Lee maintained that he asked Smith if anyone else was inside before entering.

### b. Procedural History

Plaintiffs sued Lee, Barker, Officer Christopher McConnell, and the City of Shreveport alleging federal claims of unlawful entry, excessive force, and failure to train. They also brought state law claims for trespass, battery, strict liability, excessive force, and negligence.

Defendants moved for summary judgment asserting qualified immunity on behalf of all individual Defendants and seeking dismissal of Plaintiffs' *Monell* and state law claims. The district court dismissed the *Monell* claim against Shreveport and all claims against McConnell. *Smith v. Lee*, 599 F. Supp. 3d 440, 463 (W.D. La. 2022). It denied the motion in all other respects. *Id.* Lee and Barker now appeal the denial of qualified immunity from the unlawful entry and excessive force claims against them.

## II. Jurisdiction

In appeals of orders denying qualified immunity, we only have jurisdiction to review "the purely legal question [of] whether a given course of conduct would be objectively unreasonable in light of clearly established law." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc). "[W]e can review the materiality of any factual disputes, but not their genuineness." *Id.* (citing *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir.2000)).

No. 22-30241

## III. STANDARD OF REVIEW

Because we lack the authority to review the district court's decision that a genuine factual dispute exists, we do not apply the ordinary summary judgment standard in an interlocutory appeal concerning the denial of qualified immunity. *Kinney*, 367 F.3d at 348. Instead, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiff's version of the facts as true. *Id.* When the district court fails to set forth the factual disputes that preclude granting summary judgment, we may be required to review the record in order "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Id.* (citing *Johnson v. Jones*, 515 U.S. 304, 319, (1995)). Our review of the district court's conclusions concerning the materiality of the facts is de novo. *Id.* at 349.

## IV. DISCUSSION

Defendants have asserted the defense of qualified immunity. Qualified immunity provides government officials with immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). We apply a two-part test: (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the violation. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citation omitted). Both questions are matters of law. *Id.*

### a. Smith's Unlawful Entry Claims

Smith alleges that Barker and Lee violated her Fourth Amendment rights by entering her home without consent or any other legal justification.

5

Under the Fourth Amendment, a warrantless intrusion into a person's home is "presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify" the intrusion. *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 420 (5th Cir. 2008). There are two forms of consent: explicit and implicit. Implicit consent "can be inferred from silence or failure to object to a search only if that silence follows a request for consent." *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020). Implicit consent based on silence or failure to object must "follow[] a police officer's explicit or implicit request for consent." *United States v. Escamilla*, 852 F.3d 474, 484 (5th Cir. 2017) (citation omitted). "It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996). Without more, "[s]ilence or passivity cannot form the basis for consent to enter." *Roe v. Texas Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 402 (5th Cir. 2002).

### i. Whether Smith Has Alleged Fourth Amendment Violations

We begin at the first step: whether Smith has sufficiently alleged a violation of her Fourth Amendment rights. Defendants do not contend that any other exception to the warrant requirement was present to justify a warrantless entry. Rather, they claim both officers are entitled to qualified immunity because they reasonably believed Smith consented to their entry.

Turning first to Smith's unlawful entry claim against Barker, she claims she was barefoot and wanted to retrieve her shoes when Barker stepped inside her home to block her from going back inside. Defendants acknowledge the factual dispute over whether any officer expressly requested permission and whether Smith expressly gave officers permission to enter her home. They then claim the district court only identified a factual dispute over whether the officers explicitly requested permission to enter the home.

However, the district court identified a broader factual dispute. Namely, whether the officers made a request, explicit *or* implicit, for permission to enter Smith's home. *Smith*, 599 F. Supp. 3d at 454 ("Under Smith's version of the facts, there was no explicit or implicit request for permission to enter, and thus there was no consent."). Nevertheless, Defendants argue that when Barker allegedly entered Smith's home, he reasonably believed she had consented to a search of her home because the officers had explained they were looking for Combs and asked Smith if anyone else was inside her residence.

As this court has previously held, an implicit or explicit request for consent is a necessary predicate to a finding of implicit consent based on a subject's silence or failure to object to a search. *Escamilla*, 852 F.3d at 484. If the officers at the front door did not request permission to enter Smith's home either implicitly or explicitly, then they could not reasonably believe that Smith's silence or acquiescence gave them permission to enter. At most, they asked if anyone else was inside the home, but that does not amount to an express or implied request to enter her home. Without such a request, Smith's silence cannot amount to consent for Barker to enter her home. *Roe*, 299 F.3d at 402. Furthermore, the dispute over whether Barker entered Smith's home to prevent her from returning inside is material since an intrusion into someone's residence without legal justification, even if only by "a fraction of an inch," violates the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 37 (2001). Accepting Smith's version of the facts as true, she has sufficiently alleged that Barker violated her Fourth Amendment rights.

Turning next to Smith's unlawful entry claim against Lee, Defendants argue that "[i]t should have been obvious to any person in Ms. Smith's situation that Cpl. Lee intended to enter her home with a canine, and at no time did Ms. Smith voice any objections or tell any officer on scene that they

could not enter her home." Again, if the officers did not request permission to enter Smith's home either implicitly or explicitly, then they could not reasonably believe that Smith's silence or acquiescence gave them permission to enter. According to Smith, the officers asked her if anyone else was inside her home. Barker then stepped into her house to block her from going back inside. She was then told to leave her house and stand in her driveway. The house was surrounded by other officers. There is a genuine factual dispute over whether Lee asked Smith if anyone else was inside her home before entering, so we assume that he did not ask. At this point, Lee went to the front door, entered Smith's home, and released Dice in the house. As Smith stated, "[s]he did not feel she was in a position to object. It was like the police were going to do whatever they wanted regardless of what she had to say." Accepting Plaintiffs' version of the facts as true, the officers never directed any express or implied request at Smith to enter her home. Without such a request, Smith's acquiescence cannot amount to consent. *Jaras*, 86 F.3d at 390 ("mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent.").

However, there is a crucial fact issue with respect to Lee that the district court did not directly address. Namely, whether Lee reasonably believed the other officers asked for consent before entering Smith's house. Again, Lee was stationed at the back of the house while the other officers spoke with Smith at her front door. According to Lee, Barker told him they were "good to go" when they traded places, which he understood to mean that the other officers had acquired Smith's consent. Defendants claim Lee reasonably relied on this statement, so his search of Smith's residence was not a constitutional violation. Barker's alleged statement is material because Lee is entitled to reasonably rely on information provided to him by other officers. *Gates*, 537 F.3d at 430 ("the Supreme Court has held that police

No. 22-30241

officers may act on the basis of information known by their colleagues in conducting searches and seizures."). As we held in *Gates*,

> Because TDPRS concluded that it was necessary to remove the Gates children, the Fort Bend deputies were entitled to *reasonably* rely on TDPRS's assessment of the situation. The Fort Bend deputies' reliance was reasonable in this case because the deputies were aware that the TDPRS employees had questioned the children for several hours, which would indicate that TDPRS was making an informed decision.

*Id.* at 431 (emphasis added).

Plaintiffs first challenge this argument by contesting whether Barker even uttered these words. Second, they argue that even if Barker told Lee they were "good to go," the statement is too vague to communicate that the other officers had acquired Smith's consent. Since the district court did not weigh in on these disputes, we have independently reviewed the record "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Kinney*, 367 F.3d at 348 (citation omitted).

In his deposition, Lee explained that he would have to be satisfied that he had permission to enter Smith's home since he was the one entering with the canine. He also explained that the officers held a meeting before both searches where it was "very clear that we had to have [permission] before we could enter the homes." According to Lee, Barker would not have told him they were good to go if he did not have Smith's consent. In his affidavit, Lee again stated he "was advised that [they] were 'good to go,' which meant officers had obtained consent to search."

In his deposition, Barker testified that he did not ask for consent to search Smith's house. He also did not recall if any other officer asked for consent to search Smith's house. However, Barker later claimed in his

affidavit that "based on all discussions that had occurred with Ms. Smith on her front porch, [he] believed Ms. Smith consented to a search of her home." Nowhere in Barker's police report, deposition, or affidavit does he attest to telling Lee they were "good to go" when they switched places.

While it may have been reasonable in this context for Lee to rely on Barker's "good to go" statement as communicating that the officers had gained consent, there is a genuine factual dispute as to whether this statement was made. Lee claims Barker would not have told him they were good to go if he did not have Smith's consent. But Barker admitted at the time of his deposition that he did not ask for consent and did not recall if any other officer had. He also never attested to saying these words to Lee. This dispute is material because Lee based his belief that the other officers had obtained consent on this purported statement. If the statement was never made, then that places Lee in the same factual scenario as Barker. Since the district court denied qualified immunity to Lee for unlawful entry, it likely assumed Plaintiffs' version of this factual dispute.

Accepting Plaintiffs' version of the facts as true, Lee entered Smith's home without implicitly or explicitly requesting Smith's consent to enter and without any basis to believe that any other officer had acquired Smith's consent to enter. Accordingly, Smith has sufficiently alleged that Lee violated her Fourth Amendment rights.

## ii. Whether Smith's Fourth Amendment Right Was Clearly Established

At the second step, we must determine whether Smith's Fourth Amendment rights were clearly established at the time of the violation. *Cooper*, 844 F.3d at 522. Smith's right to not have her home searched without a warrant, consent, or other legal justification was clearly established in 2018. "[T]he law regarding consent and exigent circumstances has been clearly

established for some time." *Gates*, 537 F.3d at 424.[1] More specifically, it is "well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *Jaras*, 86 F.3d at 390; *see also Roe*, 299 F.3d at 402 ("[s]ilence or passivity cannot form the basis for consent to enter" a home). Accepting Plaintiffs' version of the facts as true, the officers did not implicitly or explicitly request permission to enter, but Barker and Lee entered her home anyway. In such a scenario, both Barker and Lee's entry "would be objectively unreasonable in light of clearly established law." *Kinney*, 367 F.3d at 347. Every reasonable officer would know they cannot enter a house based on the occupant's silence without first making an implicit or explicit request to enter. Lee and Barker are not entitled to qualified immunity from Smith's unlawful entry claims at this stage.

### b. Stewart's Excessive Force Claim

Stewart alleges that Lee violated his Fourth Amendment right to be free from excessive force by releasing Dice into the house with instructions to bite and allowing Dice to continue to bite him. To prevail on his excessive force claim, Stewart must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (citation omitted). "[O]fficers must assess not only the need for force, but also 'the relationship between the need and the

---

[1] The Supreme Court has recently expressed uncertainty about whether circuit-level precedent qualifies as controlling authority for purposes of qualified immunity. *D.C. v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018). However, the Court previously held that officers were entitled to qualified immunity because "the Petitioners have not brought to our attention any cases of controlling authority *in their jurisdiction* at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (emphasis added). Accordingly, we look to both Supreme Court precedent and our binding precedent as controlling for purposes of qualified immunity. *See, e.g.*, *Cooper*, 844 F.3d at 524.

amount of force used.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). "The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). Defendants do not contest that the alleged puncture wounds and lacerations to Stewart's left thumb, left calf, and left thigh amount to a constitutionally cognizable injury. Defendants also do not contest that Lee used force by releasing Dice into the home with the instruction to bite whomever he encountered inside the house. Whether the force used was "excessive" or "unreasonable" depends on "the facts and circumstances of [this] particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). For this inquiry, we look to the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

### i. From the Initial Entry

Stewart first argues that because Lee illegally entered Smith's home, deploying Dice with the instruction to bite was excessive to begin with. The district court found that Stewart had alleged a constitutional violation after applying the *Graham* factors to Stewart. *Smith*, 599 F. Supp. 3d at 456. At the second step of the QI analysis, it concluded that "an officer cannot commit an unauthorized entry into a private residence and then release a police dog on whomever happens to be inside." *Id.* at 457. There are two problems with this analysis. First, while Stewart was not suspected of any crime and posed no threat to others, he is not the proper subject of the *Graham* inquiry because he is not the suspect the officers were looking for. In this scenario, the factors should be applied to Combs. Second, we have held in an analogous context that a "[plaintiff's] excessive force claim is separate and distinct from her unlawful arrest claim, and we must therefore analyze the excessive force

claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). Stewart's excessive force claim is separate and distinct from Smith's unlawful entry claim, so we analyze the use of force without regard to the lawfulness of Lee's entry.

Applying the first *Graham* factor to Combs, he was wanted for second degree murder—undoubtedly one of the most severe offenses. As to the second factor, the arrest warrant alleged that Combs shot and killed another man, so the officers had reason to believe he was dangerous. One officer claimed that the person who provided the tip on Combs' whereabouts also stated that Combs was armed. Lastly, the officers believed that Combs was hiding at the time. Given the apparent danger of this suspect and situation, Lee's decision to deploy Dice with the command to bite and hold the first person he found inside the house was reasonable. Therefore, Stewart has not alleged a constitutional violation for any force used between the time Lee entered Smith's house and the time he realized that the person Dice was biting was not Combs.

### ii. The Duration of the Bite[2]

In the alternative, Stewart argues that the duration of the dog bite was objectively unreasonable. Stewart, however, has not raised a genuine, material fact issue that the law was so clear that no reasonable officer facing a similar situation would have acted as did Officer Lee. *See Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 600 (2004). For this excessive force claim, Officer Lee is entitled to qualified immunity.[3]

---

[2] Judge Graves dissents from this part of the opinion, written by Judge Jones and joined by Judge Smith.

[3] Because no "existing precedent 'squarely governs' the specific facts at issue," we elect to begin and end our qualified immunity analysis at the second step. *See Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) ("We can analyze the prongs in either order or resolve the case on a single prong.").

No. 22-30241

According to Stewart, he heard some commotion outside and got up from his bed. He walked toward the bedroom door and met Dice, who started to bite him on his leg. At this point, Lee was not in the bedroom, but was at the nearby hallway door to the living room. It is undisputed that Dice started biting Stewart outside of Lee's line of sight.[4] Dice bit Stewart on the lower leg; Stewart pushed him off; Dice then bit Stewart on the hand; Stewart kicked him off; Dice finally bit Stewart on the thigh. Only then did Lee appear in the bedroom doorway.[5] Stewart yelled three or four times "get your dog off," and within three seconds, Lee released Dice. Lee's testimony adds that Dice did not respond to his initial verbal command, but let go after Lee grabbed Dice's collar while still giving the command. When pressed at his deposition to state how long the dog was biting him, Stewart responded, "I couldn't say." Later, in his sworn declaration, Stewart stated that he believed Dice was biting him for "at least a minute."

This train of events distinguishes *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), the only binding precedent cited by Stewart for a supposedly "clearly established" rule that "when no reasonable officer could conclude that a suspect poses an immediate threat to law enforcement officers or others, it is unreasonable to use K9 force to subdue a suspect who is complying with officer instructions." *Shumpert v. City of Tupelo*, 905 F.3d

---

[4] The dissent disagrees and states that "Stewart recounts seeing an officer in the hallway when Dice first bit him." Throughout this litigation, Stewart has insisted that Lee lost sight of Dice. Numerous record references support this statement.

[5] The dissent states that "[n]othing in the record dictates this conclusion." To the contrary, the chronology of events according to Stewart's own declaration has Dice biting Stewart multiple before times before Lee "appeared in the doorway."

14

No. 22-30241

310, 322 (5th Cir. 2018) (alterations adopted and quotation omitted) (articulating the legal principle clearly established in *Cooper*).[6]

In that case, Cooper was pulled over for a suspected DUI, panicked, and fled on foot into a residential neighborhood. *Cooper*, 844 F.3d at 521. Responding to the call for back-up, an officer and his K9 unit found Cooper and the dog bit Cooper on the leg. *Id.* Cooper had not attempted to flee or strike the dog and was obviously unarmed. *Id.* The canine officer witnessed the initial bite. While Cooper was still gripped by the canine's teeth, the officer ordered Cooper to show his hands and submit, roll on his stomach, and finally, the officer handcuffed him. *Id.* Only then, one to two minutes after the initial bite, did the officer order the dog to release Cooper, who suffered serious and prolonged injuries. *Id.* This court affirmed the denial of qualified immunity to the canine officer. *Id.* at 526. But the opinion is confined to the facts of the case, and it held, "subjecting a compliant and non-threatening arrestee to a lengthy dog attack was objectively unreasonable." *Id.* at 524–25. The court refused to "say that *any* application of force to a compliant arrestee is *per se* unreasonable," and we explicitly declined to "opine on the line of reasonableness." *Id.* at 524.

For several reasons, *Cooper* does not squarely govern the "specific facts at issue" in this case. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). First, this is not a case where the officer is accused of siccing a police dog on an unarmed and compliant suspect. *Cf. Cooper*, 844 F.3d at 521; *Priester v. City of Riviera Beach*, 208 F.3d 919, 923–24 (11th Cir. 2000); *Edwards v. Shanley*, 666 F.3d 1289, 1293 (11th Cir. 2012). As discussed above, Lee was on the hunt for a murderer, not a drunk driver. Second, unlike the officer in

---

[6] The Supreme Court "has not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *Wesby*, 138 S. Ct. at 591 n.8.

*Cooper*, Lee did not see the initial bite. Rather, he sent Dice into the house and heard the dog encounter someone, whom he fully expected to be the murder suspect. Third, Dice was biting Stewart for some amount of time before Lee appeared in the bedroom doorway. In contrast, the officer in *Cooper* was present for the complete duration of the bite. Fourth, Lee released Dice *before* handcuffing Stewart. Finally, Lee did not order an already-compliant, unarmed suspect to further prostrate himself while being bitten. In fact, the only commands given were from Stewart to Lee to "get your dog off," which Lee did a few seconds later.

In sum, except as in *Cooper*, including the significant fact that the dog was deployed as a wholly duplicative means of detention, no precedent establishes under analogous circumstances how long a bite is too long. Thus, a jury could not find that every reasonable officer would have known that a K9-trained dog had to be released more quickly. Even if Officer Lee mistakenly permitted Dice to bite Stewart for a minute, qualified immunity shields him from suit as well as liability.

## V. Conclusion

Lee and Barker are not entitled to qualified immunity from Smith's unlawful entry claims. But Lee is entitled to qualified immunity for any force employed from the moment he entered Smith's house.[7] Therefore, we REVERSE in part and AFFIRM in part.[8]

---

[7] Judge Graves dissents in part from this holding. He would find that Lee is entitled to qualified immunity for any force employed between the time he entered Smith's house and the time he recognized that Stewart was not Combs, but that he is not entitled to qualified immunity to the extent that he allowed Dice to continue biting Stewart for a lengthy period of time after realizing he was not Combs.

[8] We also DENY Plaintiffs' motion to dismiss the appeal for lack of jurisdiction.

No. 22-30241

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting in part:

Because I would find that Lee is not entitled to qualified immunity from Stewart's excessive force claim based on the duration of the bite, I dissent from the majority's analysis and conclusion in part IV.b.ii.

According to Lee, he had Dice on a twenty-foot leash and briefly lost sight of the dog when it entered the room where Stewart was. When Lee heard Dice engage with someone, he moved towards the sound, recognized that the person Dice was biting was not Combs, and immediately got Dice to release the bite. According to Stewart, he was moving past the corner of the bed in the room when Dice first bit him on the leg. At that point, he could see an officer in the hallway. He pushed the dog off with his hands, but then Dice began biting his hand. He then pushed Dice off with his feet, but Dice began biting his thigh. While biting him, Dice would shake his head back and forth causing Stewart more pain. When Lee appeared in the doorway, "he just stood there silently observing the attack." Stewart yelled three or four times for Lee to get the dog off him, but he did not get Dice to release until at least the third time. Stewart claims Dice was biting him for at least a minute. The district court identified genuine, material factual disputes that prevented summary judgment on this claim: "Even if the initial use of force, i.e., the initial bite, could be deemed reasonable under a version of the facts more favorable to Defendants, Corporal Lee still acted unreasonably in allowing Dice to bite multiple times over an extended duration." *Smith*, 599 F. Supp. 3d at 456.

Instead of viewing the facts in the light most favorable to Stewart and drawing reasonable inferences in his favor, the majority resolves numerous genuine factual disputes in Lee's favor. First, the majority claims "it is undisputed that Dice started biting Stewart outside of Lee's line of sight." But Stewart recounts seeing an officer in the hallway when Dice first bit him.

17

Given the evidence before us, it is possible that 1) Lee was the officer Stewart saw in the hallway, and 2) Dice started biting Stewart within Lee's line of sight. Second, the majority claims that Lee first appeared in the bedroom doorway only after Dice bit Stewart for the third time. Nothing in the record dictates this conclusion, and a reasonable inference can be drawn in Stewart's favor that Lee appeared in the doorway before then. Third, the majority notes that "Stewart yelled three or four times 'get your dog off,' and within three seconds, Lee released Dice." While Stewart claims Lee released Dice after the third time he called out, a genuine factual dispute remains as to how much time transpired between each time Stewart yelled for Lee to get the dog off him. To the extent the majority implies that Stewart yelled three or four times in rapid succession, that would again resolve this factual dispute in Lee's favor. Finally, the majority notes a tension between Stewart's deposition testimony and declaration regarding the duration of the bite. The district court identified this factual dispute as genuine by crediting Stewart's claim that the bite lasted at least a minute, and we do not have jurisdiction to second guess that finding. *Id.* ("When construed in Stewart's favor, the facts are that . . . Stewart suffered multiple bite wounds in an encounter that lasted at least one minute."); *Kokesh v. Curlee*, 14 F.4th 382, 390 (5th Cir. 2021) ("the district court's finding that a *genuine* factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal.") (internal quotation marks and citations omitted) (emphasis in original).

Relying on this court's decision in *Cooper v. Brown*, Stewart argues that Lee should not receive qualified immunity at this stage. 844 F.3d 517 (5th Cir. 2016). I agree. *Cooper* sets forth the clearly established law: "subjecting a compliant and non-threatening arrestee to a lengthy dog attack [is] objectively unreasonable." *Id.* at 525. In order to reach this principle, this court relied on an excessive force case where an officer slammed a compliant

arrestee's face into a vehicle and another where an officer tased a non-threatening arrestee. *Id.* We explained that Cooper's right was clearly established because "[o]ur caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced." *Id.* at 524. The fact that those two cases did not involve dog bites did not shield the officer because the "[l]awfulness of force . . . does not depend on the precise instrument used to apply it. Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Id.* at 525 (quoting *Newman v. Guedry*, 703 F.3d 757, 763-64 (5th Cir. 2012)).

The majority first claims that the "the opinion [in *Cooper*] is confined to the facts of the case," because the court did not "say that *any* application of force to a compliant arrestee is *per se* unreasonable," and did not "opine on the line of reasonableness." *Id.* at 524. Nevertheless, since the officer subjected Cooper to a lengthy dog attack even after he was compliant, this court "state[d] only the obvious: Under the facts in this record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." *Id.* And as discussed above, the clearly established law outlined in *Cooper* applies with equal force to this case.

The majority next attempts to distinguish *Cooper* by claiming that this is "not a case where the officer is accused of siccing a police dog on an unarmed and compliant suspect." But in *Cooper*, the officer "continued applying force even after Cooper was actively complying with his orders." *Id.* at 523. Thus, *Cooper* was not just about the initial decision to sic a police dog on a suspect; it was about the decision to "permit[] a dog to continue biting a compliant and non-threatening arrestee." *Id.* at 524. Here, Lee employed Dice to search for Combs, but Lee claims it was immediately apparent to him that the man Dice was biting was not Combs. Once Lee realized that he was not Combs but a seventy-eight-year-old bystander, the *Graham* factors no

longer weighed in Lee's favor. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The man Dice was biting was not Combs, so there was no crime at issue and no reason to believe that Stewart posed an immediate threat to the safety of officers or others. *Id.* As to the third factor, there is no indication that Stewart was resisting or attempting to evade arrest. *Id.* This realization is akin to the moment where Cooper began actively complying with the canine officer's orders—at that point in time, he was compliant and non-threatening, so the need for force was substantially reduced. *Cooper*, 844 F.3d at 523. Thus, *Cooper* still applies to the extent that Lee permitted Dice to continue to bite Stewart even after realizing he was not the suspect they were seeking.

The majority also claims that "no precedent establishes under analogous circumstances how long a bite is too long." To be sure, *Cooper* did not set a bright-line rule for exactly how many seconds amounts to an unconstitutional dog attack on a compliant subject—it instead held that "subjecting a compliant and non-threatening arrestee to a lengthy dog attack was objectively unreasonable." *Id.* at 525. While *Cooper* did not define what a "lengthy" dog attack is, one lasting one to two minutes clearly falls within this category. *Id.* at 521. A genuine material factual dispute remains over how long Lee permitted Dice to continue biting Stewart after realizing he was not Combs. Again, the district court identified a genuine fact dispute as to whether the biting lasted at least one minute. During his deposition, Stewart testified that "about three seconds" passed between when he last yelled at Lee to release the dog and when Lee released Dice. In his declaration, Stewart states that he yelled "at least three times before the officer got the dog to release." Stewart also testified in his deposition that "[Lee] just st[oo]d up in that door there and that dog kept biting on me," and that Lee released Dice "[a]fter [Dice] bit so long." Reading this evidence in Stewart's favor, the moment that Lee pulled Dice off Stewart could have taken place long after the moment he realized Stewart was not Combs. The majority again attempts

to distinguish *Cooper* by stating "Dice was biting Stewart for some amount of time before Lee appeared in the bedroom doorway," but that only underlines the genuine factual dispute in this case. We do not know *what* amount of time transpired between the moment Dice first bit Stewart, the moment Lee appeared in the doorway, and the moment Lee realized Stewart was not Combs. Assuming the bite lasted longer than a minute as we must, a material factual dispute remains as to whether Lee permitted Dice to continue biting Stewart for a lengthy period after realizing he was not Combs.

For these reasons, I would find that Lee is not entitled to qualified immunity because *Cooper* gave him fair warning that subjecting a compliant and non-resisting subject to a lengthy dog attack is a violation of clearly established law. *Id.* at 525.