# United States Court of Appeals for the Fifth Circuit

———————————

No. 24-40535

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2026

Lyle W. Cayce
Clerk

Jorge R. Martinez,

*Plaintiff—Appellant*,

*versus*

Officer David Hinojosa; City of Laredo,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:20-CV-75

———————————————————————

Before Southwick, Higginson, and Wilson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

This is a tragic case of mistaken identity. A police officer believed he was targeting a gunman who had been firing on police from a residence. Instead, he shot and badly wounded a man who had disarmed the actual shooter and then emerged from the residence holding the weapon. The issue here is whether that officer's mistake led to a violation of the victim's constitutional rights. As lamentable as these events certainly were, we agree with the district court that no constitutional violation occurred on the specific facts of this case. The district court denied relief. We AFFIRM.

No. 24-40535

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 5:42 a.m. on November 26, 2019, two officers of the Laredo Police Department responded to a domestic disturbance at a residence in their city.  As the officers reached the scene, Cesar Terrazas opened fire on them with an AR-15-style rifle, striking one officer in the leg.  After a brief gunfight with the officers, Terrazas broke into the home where the plaintiff, Jorge Martinez, lived along with his mother and sister.  Once inside, Terrazas shot and wounded Mr. Martinez's mother before Mr. Martinez and his sister overpowered and disarmed Terrazas.  Still inside the home, Mr. Martinez removed the magazine from Terrazas's rifle.

Officer Hinojosa arrived on the scene at 5:51 a.m., only seconds before Terrazas entered Mr. Martinez's home.  At 5:52, Officer Hinojosa retrieved a rifle from his vehicle and began walking toward the gunfire.[1]  Unaware of the suspect's identity, description, or clothing, Officer Hinojosa stopped and established a defensive position approximately 60 yards from Mr. Martinez's home.

Just before 5:56 a.m., Mr. Martinez exited the home completely naked and carrying the confiscated weapon in his left hand.  We found no explanation in the record for why Mr. Martinez wore no clothes.  Once outside, he walked a few steps away from the home and shouted, "I am not the shooter."  Officer Hinojosa — who would later state he did not hear Mr. Martinez and perceived him as the suspect — immediately alerted his fellow officers: "He's naked," and "[h]e's got a 32."  Mr. Martinez then quickly walked between two vehicles and into the street.  There, he first turned 90

---

[1] As mentioned, Terrazas entered Mr. Martinez's home shortly after Officer Hinojosa arrived on the scene.  The record is not clear as to when the shooting stopped or to whom each shot can be attributed.  The body camera footage captures occasional shots being fired from the moment Officer Hinojosa arrived until Mr. Martinez was shot.

degrees to his right — causing him to face away from Officer Hinojosa — then turned completely around such that he was facing directly toward that officer. That is when Officer Hinojosa shot him once in the abdomen. That officer stated, in his post-incident statement, that he "fear[ed] for [his] safety and the safety of other officers and the public in the area."[2] Though he suffered severe injuries, Mr. Martinez survived the shooting.

In May 2020, Mr. Martinez filed suit in the United States District Court in Laredo, asserting claims under 42 U.S.C. § 1983. The complaint alleged the three police officers used excessive force that night and the City of Laredo had not properly trained them.[3] He filed an amended complaint in September 2020, then a second amended complaint in February 2021. On April 15, 2021, the district court dismissed all of Mr. Martinez's claims, with leave to amend. Mr. Martinez later filed a third, then a fourth, amended complaint.

Defendants moved for judgment on the pleadings as to the City and for summary judgment as to Officer Hinojosa, who asserted qualified immunity. The district court granted the motion, holding that no constitutional violation had occurred. As a result, the court held that Officer Hinojosa was entitled to qualified immunity, and all municipal liability was foreclosed.[4] Mr. Martinez timely appealed.

_____

[2] Officer Hinojosa shot Mr. Martinez approximately 13 seconds after he exited the home.

[3] His original complaint included claims against two other City of Laredo police officers and an "independent substantive due process claim" against Officer Hinojosa. These claims were dismissed with prejudice and are not subject to our review.

[4] In 1978, the Supreme Court held that a claim for municipal liability may be brought under Section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Importantly, "every *Monell* claim requires 'an underlying constitutional violation.'" *See Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017).

## DISCUSSION

We review *de novo* a district court's grant of summary judgment and apply the same standards as the district court. *Curtis v. Anthony*, 710 F.3d 587, 593 (5th Cir. 2013) (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Factual disputes are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and they are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Notwithstanding factual allegations that are "blatantly contradicted by the record," we "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing'" summary judgment. *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### I.   *Section 1983 & Qualified Immunity*

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Specifically, "Section 1983 enables persons who have been 'depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws' of the United States by the actions of a person or entity operating under color of state law to seek redress from those state actors responsible for the deprivations." *Surratt v. McClarin*, 851 F.3d 389, 392 (5th Cir. 2017) (alteration in original) (quoting 42 U.S.C. § 1983). Qualified immunity, though, protects those government officials from liability under Section 1983, "insofar as their conduct does not violate clearly established statutory or constitutional rights." *Trammel v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)). "If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (citation omitted).

## II. *Constitutional Violation*

An officer's use of excessive force is an unreasonable seizure in violation of the Fourth Amendment. *See Graham*, 490 U.S. at 394–95. To establish "a Fourth Amendment excessive-force claim, a plaintiff must show two things: (1) a seizure occurred; and (2) the force used was unreasonable." *Estate of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 238 (5th Cir. 2025) (footnote omitted).

### A. Seizure

A Fourth Amendment seizure occurs either when physical force is used or through the seized person's "voluntary submission to a show of authority or the termination of freedom of movement" of that person. *Torres v. Madrid*, 592 U.S. 306, 322 (2021). In either context, the government's means of affecting the seizure must be "intentionally applied." *Kennedy v. City of Arlington*, 165 F.4th 937, 943 (5th Cir. 2026).

The relevant intentional act here was the use of force against a person who was mistakenly believed to be the one who had earlier been shooting at other police officers. A seizure may occur even "when an unintended person or thing is the object of the detention or taking." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). Such mistakes typically fall into two factual scenarios. In one, a law enforcement officer fires at the actual suspect "but misses, accidentally hitting a bystander." *Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir. 2001), *abrogated in part on other grounds by Pearson v. Callahan*, 555

U.S. 223 (2009).  The Fourth Circuit concluded that "the innocent victim's injury or death is not a seizure that implicates the Fourth Amendment because the means of the seizure were not deliberately applied to the victim." *Id.* at 163–64.  Those are not our facts, and we express no opinion as to whether that is the proper view.

The other scenario, the one that occurred here, is when an officer "shoots . . . a person he believes to be the suspect and hits the intended target, but in fact, the target was misidentified and turns out to be an innocent victim."  *Id.* at 163.  "This seizure of the innocent victim implicates the Fourth Amendment, but it is not necessarily unreasonable and therefore in violation of the Fourth Amendment."  *Id.* at 164.

The Fourth Circuit in *Milstead* relied on a Supreme Court precedent that no *unconstitutional* seizure occurs when an officer's mistake as to the identity of the person was based on "sufficient probability, not certainty," as that "is the touch-stone of reasonableness under the Fourth Amendment." *Id.* (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)).  Though a seizure has occurred, the seizure "is not necessarily unreasonable and therefore in violation of the Fourth Amendment."  *Id.*

Notwithstanding the mistake of identity, Mr. Martinez was "the object of" the application of force.  *See Brower*, 489 U.S. at 596.  That means that a seizure occurred.  We now must decide if the seizure, as unfortunate as it was, was reasonable.

### B. Reasonableness

The touch-stone for whether a constitutional violation occurred is reasonableness.  *See County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of

'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  This test is not capable of mechanical application, *id.*, but instead it "requires analyzing the 'totality of the circumstances,'" and "demands 'careful attention to the facts and circumstances' relating to the incident." *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (first quoting *Mendez*, 581 U.S. at 427–28; and then quoting *Graham*, 490 U.S. at 396).

"An officer's use of force is unreasonable under the Fourth Amendment if the plaintiff shows: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Estate of Parker*, 140 F.4th at 239 (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).  Because Officer Hinojosa used deadly force, "injury and causation are established," *see McVae v. Perez*, 120 F.4th 487, 492 (5th Cir. 2024), leaving only for our determination a "single objective-reasonableness inquiry." *Bailey v. Ramos*, 125 F.4th 667, 680 (5th Cir. 2025) (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018)).

When endeavoring to balance competing Fourth Amendment interests, we recognize that deadly force is the ultimate intrusion. *Aguirre v. City of San Antonio*, 995 F.3d 395, 407 (5th Cir. 2021); *see Garner*, 471 U.S. at 9–10.  As a result, when deadly force is involved, our inquiry is "constrained." *Batyukova v. Doege*, 994 F.3d 717, 725 (5th Cir. 2021) (citation omitted).  While we consider other factors, such as the severity of the crime at issue and the suspect's flight or active resistance to apprehension, *see Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020),  they are subordinate to our ultimate standard: "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer

reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). "[A]n immediate threat to safety[] is generally the most important factor in determining the objective reasonableness of an officer's use of deadly force." *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023).

Along with this understanding of the task, we also consider that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. To that end, we evaluate reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and caution ourselves against "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (citation omitted). After all, "to be reasonable is not to be perfect." *Beuhler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61–62 (2014)).

Mr. Martinez argues that summary judgment was improper because the evidence demonstrates genuine disputes of material fact as to whether Officer Hinojosa's use of deadly force was objectively unreasonable. We first address Officer Hinojosa's perception of Mr. Martinez as an imminent threat, then discuss the reasonableness of his use of force.

### 1. Mistaken Identity

In granting summary judgment, the district court accepted that "Officer Hinojosa's decision turned out to be a mistake, [but] there is no Fourth Amendment violation because he believed in good faith that he and his fellow officers faced imminent danger[. R]elying on that belief, he made a reasonable mistake."

While Mr. Martinez was *not* Terrazas, or otherwise a threat to anyone, he is not the principal focus of our inquiry. *See Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023). Rather, in keeping with our charge of avoiding such retrospective determinations, we must consider whether Officer Hinojosa reasonably believed Mr. Martinez was in fact the shooter. *See id.*; *Ryburn*, 565 U.S. at 477.

Mr. Martinez's primary argument is that a fact question exists regarding whether or not Officer Hinojosa heard Mr. Martinez shout that he was "not the shooter." In support, Mr. Martinez offers dashboard and body-camera footage, as well as two testifying neighbors who were present the night of the shooting. While the dashboard footage contains no audio, Mr. Martinez alleges that even though the words are unclear, "you can hear the plaintiff shouting on Officer Hinojosa's Body Camera system." Additionally, two of Mr. Martinez's neighbors — Hector Flores and Blanca Hill — testified that they heard him shouting that he was not the shooter. Martinez argues that because Flores "was further from Martinez than Officer Hinojosa," it is plausible that Mr. Martinez's "declarations were audible to Hinojosa."

The district court held that Officer Hinojosa's testimony that he could not hear Mr. Martinez was uncontroverted. As to the video footage specifically, the court stated:

> There is no discernable audio of Plaintiff shouting "I'm not the shooter." There is some barely audible sound of someone's voice in the distance, but the words are inaudible on the audio of the body camera footage. To the extent Plaintiff asserts that this audio recording reflects what Officer Hinojosa could hear at the time of the shooting, it does not support the conclusion that [he] could clearly hear Plaintiff shouting 'I'm not the shooter' before he fired."

9

Our listening to the body camera recording revealed that the sounds on the audio are overlapping and indistinct. No shouted words can be discerned. It is true that video evidence can prevent contrary testimony from creating a fact issue about what appears on a video. *Scott v. Harris*, 550 U.S. 372, 378 (2007). What can be conclusive about a video concerns what physically occurred. On the other hand, a video may not display exactly what a person would have seen from the same location as the camera. One reason is that a person may have poor eyesight. Another reason is the opposite, *i.e.*, video can be blurry or otherwise of poor quality. That may not keep the video from being factually definitive as to what occurred.

We have been directed to no precedent treating audio recordings as definitive as to what a person would have heard from the same location as the device that was recording audio. Similar to video, the recording, if it has sufficient clarity, can be conclusive as to what words were said or sounds were made. The recording cannot by itself be conclusive about what a specific person in a particular location would have heard, as that depends on the quality of the person's hearing as well as the quality of the audio recording. Indeed, some microphones may record words more clearly than a person would hear; other microphones, less clearly. Some evidence would be needed to address such factual issues before a recording could be said to represent what a similarly-located person would have heard. Without more, we cannot give the audio portion of the body camera recording in this case any conclusive effect on what the officer heard.

Regardless of the recording's inconclusiveness, the disputed fact is whether Officer Hinojosa heard Mr. Martinez shouting that he was not the shooter. A genuine factual dispute about what the officer heard could arise from the testimony of two of Mr. Martinez's neighbors, one of them further away from Mr. Martinez than Officer Hinojosa, who said they heard the

shouted assertion.  We agree that such testimony does raise a genuine factual dispute, but we also must consider whether the dispute is material.

The district court held, in effect, that the dispute was not material: "Even if Officer Hinojosa could clearly hear and understand what Plaintiff was saying, it would not be unreasonable for him to conclude that the shooter may have been lying to evade the police and continue his shooting spree." Does that possibility, when considering what was objectively reasonable for an officer to do even if hearing the yelled assertion, mean that Officer Hinojosa's shooting Mr. Martinez was "clearly unreasonable"?  *Estate of Parker*, 140 F.4th at 239 (citation omitted).

Useful in answering that question is that mistaken beliefs have arisen in other contexts.  Other precedents concern an officer's mistaken belief that a suspect was reaching for a weapon.  In each case, the constitutionality of an officer's use of deadly force is justified so long as the officer had a reasonable belief that the suspect was reaching for a weapon.[5]  Whether the suspect actually had a weapon is irrelevant, as we are only concerned with what the officer knew or reasonably believed at the time. *Kingsley*, 576 U.S. at 397.

In one precedent, we concluded that an officer's use of deadly force was justified because the suspect, Manis, could not contradict the officer's

---

[5] *See, e.g.*, *Winder v. Gallardo*, 118 F.4th 638, 646 (5th Cir. 2024) ("[B]inding caselaw demonstrates that what matters is whether [the officer] could *reasonably believe* that [the suspect] was reaching for or had a gun."); *Salazar-Limon v. City of Houston*, 826 F.3d 272, 275, 279 (5th Cir. 2016) (holding that, despite the discovery that suspect was unarmed, the officer reasonably perceived the suspect to be reaching for a weapon); *Batyukova*, 994 F.3d at 717 (same); *Manis*, 585 F.3d at 845 (same); *Argueta v. Jardi*, 86 F.4th 1084, 1092 (5th Cir. 2023) (holding that whether the officer could see the weapon was immaterial); *see also Poole*, 13 F.4th at 425–26 (reversing summary judgment on qualified immunity where the officer could see the suspect was "empty-handed" and otherwise "visibly unarmed").

"testimony that he shot Manis because he believed Manis had retrieved a weapon." *Manis*, 585 F.3d at 845. There, "the *only* fact material to whether [the officer] was justified in using deadly force" was whether or not the suspect "reached under the seat of his vehicle and then moved as if he had obtained the object he sought" — a gun. *Id.* at 844. Thus, the "eventual discovery" that the threat was not real, *i.e.*, there was no gun under his seat, did not negate the officer's reasonable belief that the suspect had one. *Id.* at 842, 844.

The same conclusion can be drawn here, except for the fact that Mr. Martinez *was* indisputably armed, and the eventual discovery was of the fact that he was not a threat. In both situations, the officer has a mistaken belief as to the facts establishing the existence of probable cause to use deadly force. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001). In that context, when an officer acts on a reasonable belief, what fact the officer is wrong about generally will not matter and does not matter here.

Officer Hinojosa was forced to make a split-second judgment, and we must not scrutinize that decision with the benefit of our later knowledge. *See Ryburn*, 565 U.S. at 477. "To a reasonable officer under the circumstances," Mr. Martinez did not appear to be an innocent victim nor a "fleeing non-dangerous suspect in a non-violent crime." *See Pipkins v. City of Hoover*, 134 F.4th 1163, 1171 (11th Cir. 2025) (quoting *Powell v. Snook*, 25 F.4th 912, 923 (11th Cir. 2022)). As the district court found:

> [He] was in a dark neighborhood with a shooter on the loose and did what he reasonably thought was best to keep him and his fellow officers safe. The fact that a naked man exited the residence, while holding a rifle in his hand and yelling something that Officer Hinojosa could not clearly hear, does not mean that Officer Hinojosa should have concluded that it was not Terrazas. [His] decision to shoot a person who[m] he

12

saw emerging from a house with an automatic rifle in the context of that night's events was sufficiently reasonable to justify the use of deadly force.

To that analysis, we add only that even if the officer did hear the claim that Mr. Martinez was not the shooter, it was reasonable for him not to accept it. We conclude that this mistake was objectively reasonable.

### 2.  Use of Deadly Force

Officer Hinojosa's misidentification of Mr. Martinez was reasonable. The question remains whether the use of deadly force was reasonable. Answering that question requires us to apply these factors identified by the Supreme Court: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Obviously, whether force is excessive depends very much on the facts presented to the officer.

First, the severity of the crime to which Officer Hinojosa was responding was the shooting of another officer and an exchange of gunfire with the police. That is a severe crime.

Second, we consider whether the facts support that Officer Hinojosa reasonably believed the person he saw with a gun posed a serious threat of harm to others. Officer Hinojosa arrived on the scene at 5:51 a.m. He knew the following at that point: (1) officers were engaged in an active shootout with the suspect, and (2) an officer had been shot. Officer Hinojosa armed himself and established a defensive position. Within a few seconds, a person with an assault rifle came out of the residence where the shooting had been occurring and walked into the street. These facts, as they appeared to Officer Hinojosa, easily meet our standard for using deadly force. From this officer's perspective, he was using deadly force against an active shooter. *Estate of*

*Parker*, 140 F.4th at 240 (listing cases).  While the shooting had recently ceased prior to Officer Hinojosa's use of force, the officer could not know whether that was simply a brief interlude before more shooting occurred.

Finally, the factor of whether the suspect was resisting or attempting to flee is less clear than the other factors.  The issue, though, is whether Officer Hinojosa reasonably believed the person he saw with a gun was positioning himself to recommence his shootout with officers. It was reasonable for the officer to believe the person he saw with an assault rifle was not surrendering and subjecting himself to arrest.

"Even when a suspect is armed, a warning must be given, when feasible, before the use of deadly force." *Poole*, 13 F.4th 420, 425 (5th Cir. 2021).  In such a case, a warning is a "critical component of risk assessment and de-escalation." *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (*en banc*).  Mr. Martinez contends that Officer Hinojosa had time to issue a warning and relies on the fact that Hinojosa gave a clear post-shooting warning.

First, was a warning feasible?  As mentioned before, only 13 seconds elapsed after Mr. Martinez exited the home and until Officer Hinojosa shot him.  In that time, Mr. Martinez was acting erratically while holding a dangerous weapon, and he was shot less than three seconds after entering the street.  We have found that Officer Hinojosa's perception of Mr. Martinez as a violent suspect was reasonable, and Mr. Martinez turned towards Officer Hinojosa immediately before being shot.  These facts distinguish the case from another "standoff" precedent in which it was disputed whether the victim was turning towards officers when they fired the first shot at him. *See, e.g.*, *Cole*, 935 F.3d at 453–55.

Second, it would have been reasonable for Officer Hinojosa, arriving after other officers have been engaged in an exchange of gunfire, to assume

either that "proper procedures," such as a warning, "ha[d] already been followed," or that the actual shooter's exchange of gunfire with the police was sufficient to warn him that he would be shot. *See White v. Pauly*, 580 U.S. 73, 80 (2017). With limited knowledge of the situation, Officer Hinojosa reacted swiftly to protect himself and those around him. As a result, we conclude that Officer Hinojosa's not issuing a warning was reasonable.

Lastly, Mr. Martinez raises other arguments purporting to create a fact question as to whether or not Officer Hinojosa reasonably perceived him as an imminent threat. Mr. Martinez contends he never raised the weapon toward Hinojosa or made any other movement that could be interpreted as presenting an imminent threat, and that generally Officer Hinojosa should have understood his hand above his head as a gesture of surrender.

In considering this argument, it is important that "we have never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure" their own safety or the safety of others. *Salazar-Limon*, 826 F.3d at 279 n.6. Officer Hinojosa's testimony, as well as the video footage, supports that Mr. Martinez's erratic movements caused the rifle to move around as he walked to the street. Moreover, when he turned in the direction of the officers, Officer Hinojosa believed that the "firearm could have come up immediately." Despite Mr. Martinez's subjective attempt to surrender, we must take the facts from the perspective of the reasonable officer. As stated by the district court: "Hinojosa's decision to shoot [Mr. Martinez], while a mistake, was reasonable and not excessive given the totality of the circumstances before him."

We conclude that Officer Hinojosa did not violate Mr. Martinez's constitutional rights and that the district court did not err in granting summary judgment. Because we conclude that Mr. Martinez's constitutional rights were not violated, the City of Laredo cannot be liable:

No. 24-40535

"[M]unicipal liability under Section 1983 requires proof of . . . a violation of constitutional rights." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  Dismissal of the claims against the City was proper.

AFFIRMED.